895 So.2d 767 (2005)
STATE of Louisiana, Appellee,
v.
Kathleen JENNINGS, Appellant.
No. 39,543-KA.
Court of Appeal of Louisiana, Second Circuit.
March 2, 2005.
*768 Louisiana Appellate Project, by James E. Beal, Jonesboro, E. Roland Charles, Louis G. Scott, for Appellant.
Kathleen Jennings, Pro se.
Jerry L. Jones, District Attorney, Charles L. Brumfield, Edward D. Young, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART and LOLLEY, JJ.
STEWART, J.
The defendant, Kathleen Jennings, was found guilty as charged of second degree murder and sentenced to mandatory life imprisonment without benefits. In this out-of-time appeal, the defendant challenges the admission into evidence of three conflicting oral statements given by her to the police in the hours following the crime. She contends that her statements were not free and voluntary considering her mental state, her lack of understanding as to her rights, and her belief that only a recorded statement could be used against her. Finding no merit to her contentions and ample support in the record for the trial *769 court's ruling on the admissibility of her statements, we affirm the defendant's conviction and sentence.

FACTS
On April 5, 2001, at about 9:00 a.m., Edith Grogan gave the victim, Joseph Ray, a ride to his job at a Thrifty Liquor store in Bastrop, Louisiana. Ray's entrance into the store triggered the security alarm. The alarm monitor called the store, Ray gave the code, and then deactivated the alarm. The defendant entered the store around the same time and introduced herself as Tammy. Grogan recalled that Tammy began talking to Ray and that she asked whether the security cameras were working.
Grogan left to run errands and to get something to eat for herself and Ray. When she returned to the store around 10:30 or 11:00 a.m., the defendant was still there with Ray. When Grogan left again, the defendant remained at the store with Ray.
At 11:59 a.m., the store's silent alarm sounded at the CenturyTel Security monitoring station. The police were dispatched to the store. At 12:24 p.m., the police called the monitoring station to report that there had been a shooting at the store.
Tyrone Cobbs testified that he had stopped at the store to check lottery numbers and found Ray and a white woman with blonde hair behind the counter. Ray was on the floor and appeared to be in pain. The woman told Cobbs that Ray had fallen, and Ray told Cobbs to get help and not come back. Cobbs drove to a nearby convenience store where he called for help. He then returned to the liquor store where he found Ray alone on the floor behind the counter. Ray told him that the woman had robbed him and shot him with a shotgun. During trial, Cobbs identified the defendant as the woman he had seen in the store with Ray.
Ray also described his assailant to Gerald Boley, the first officer to arrive on the scene. Boley testified that Ray said a white, heavy set female with blonde hair had shot him and cut his throat. Ray also described the defendant's car to Boley.
A short time after noon, the defendant paid $550 in cash to Ralph Gossett, the manager of Reeves Apartments, for the deposit and a month's rent on the apartment she had recently moved into. Around 1:00 p.m., the defendant called Elizabeth Brixley, an investigator with the Morehouse Parish Sheriff's Department, ostensibly about money she owed on a phone bill. The defendant gave Brixley her location. By the time Brixley arrived, other officers had already found the defendant at Cooper Lake Grocery where she was taken into custody.
Detective John Smith advised the defendant of her Miranda rights, and she explained that she understood her rights. While riding in the car to the police department, the defendant made spontaneous statements denying any involvement in the shooting and blaming a black male for the crime. At the police station, Detective Smith again advised the defendant of her Miranda rights and read to her a "Warning Waiver Form" which she read along with him and signed at 2:19 that afternoon. The signed form, which was admitted into evidence, states that the defendant was read her rights, understands her rights, wishes to make a voluntary statement, does not want an attorney, and was not influenced by force, threats, or promises. The waiver was witnessed and signed by Smith and John Andrews, another detective. During the interview following the signing of this waiver form, the defendant stated that a black male came into the store, pushed her, and shot Ray. When the *770 man left, she crawled to Ray to help him as Tyrone Cobbs entered the store. The defendant claimed that she then left the store to follow the assailant who drove off in a Mustang. She made her way back toward the store where she saw the police and ambulance. Believing she could do nothing more to help Ray, she went home, changed clothes, and then went to the Cooper Lake Grocery to call Brixley.
A second interview took place later that afternoon after the defendant was again read her Miranda rights. Sgt. Mike Tubbs of the Morehouse Sheriff's Department went over another warning and waiver form with the defendant, who signed the form indicating that she understood her rights, did not want an attorney, and wished to make a voluntary statement. The form was signed at 4:55 p.m., and witnessed by Sgt. Tubbs and Brixley. In this statement, the defendant again denied involvement in the shooting. However, when questioned about conflicts between her statements and evidence obtained at the crime scene, she changed her story by claiming that the shooting was accidental. She claimed that she was showing the gun to Ray. He placed the gun on the counter and then it accidentally discharged as she picked it up and as Ray turned his back. Because she feared no one would believe it was an accident, she took the money from the store and left. The defendant revealed where she hid the gun and the money, and she led the officers to an area along a bayou where they retrieved the gun and a cigar box with money in it. Additional money was recovered from the apartment manager, the defendant's son, and the defendant's apartment. The amount recovered totaled $961, the exact amount written on a receipt inside the cigar box from the store.
A third interview was conducted later that evening. Detective Smith again read the Miranda rights to the defendant and read with her the warning and waiver form. The defendant placed her initials next to each of the Miranda rights and the waiver, which she signed at 8:30 that night. When questioned about a knife found at the crime scene, the defendant admitted having a knife and cutting Ray. She explained that he still had upper body strength and had grabbed her and would not let her go. She cut him to get away. Still, she continued to claim that the shooting was accidental. Smith then asked that she give a recorded statement. At this point, the defendant requested an attorney, and all questioning stopped.
Trial was interrupted for a hearing to determine whether the statements made by the defendant were free and voluntary for purposes of admissibility. Smith, Andrews, Tubbs, and Brixley testified that the defendant was read the Miranda rights, that she understood her rights, and that she signed the three warning waiver forms read and reviewed before giving statements. The testimony established that no threats, promises, or other coercive tactics were used to elicit the defendant's statements. The defense presented the testimony of Geraldine Goodson, a jail nurse, who first saw the defendant on April 6, 2001, the day after her arrest. Goodson testified that the defendant was very calm, gave one-word answers, and had a flat expression. Goodson thought she appeared shocked. The trial court ruled that both the spontaneous remarks made while being transported to the police department and the statements given while in custody were made freely and voluntarily. Thus, this evidence was presented at trial.
Testimony at trial further established that the shotgun used to shoot Ray was owned by the defendant's friend, Eddie Lee, and that the shotgun was fired at the *771 victim from a distance of five to seven feet. Mr. Ray was shot in the back and died from damage to his abdominal organs caused by the blast.
In her testimony, the defendant maintained that the shooting was accidental. She testified that Ray handed the gun back to her butt first and that he let it go as the phone rang. To keep it from falling, she grabbed the gun by the trigger, and it went off. She claimed that she was traumatized by seeing Ray's blood on her hands and that she could remember nothing thereafter until she found herself in jail the next day. As such, she claimed to have no memory of the statements she made to the police.
Dr. Richard Williams, a forensic psychiatrist, evaluated the defendant in July 2002. He diagnosed her with post-traumatic stress disorder and found her to have a significantly impaired level of functioning at that time.
During her testimony, the defendant admitted that she had previously worked at the liquor store. On rebuttal, the state called the store's owner, Elizabeth Aycock Sullivan, who testified that the defendant had been fired.
The jury returned a unanimous verdict of guilty as charged of second degree murder, a violation of La. R.S. 14:30.1. The trial court imposed the mandatory sentence of life imprisonment at hard labor upon finding no mitigating factors and noting disbelief in the defendant's claim of selective memory loss which favored her case and did not stand up to the facts established at trial.

DISCUSSION
In her only assignment of error, the defendant asserts that the trial court erred in admitting for use at trial the statements she made to the police, because it was apparent that she did not fully understand her right to an attorney. She argues that the record indicates she thought only a recorded statement could be used against her, as she did not ask for an attorney until the police asked her to give a recorded statement. She also argues that given her mental state, her statements were not freely and voluntarily made.
The state asserts that there are no facts in the record to support the defendant's arguments. No facts establish that she was mentally impaired or that she did not understand what she was doing. The state contends that the defendant's deceptive behavior suggests that she understood her actions.
The state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of a confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La.App.2d Cir.4/7/2000), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. Before introducing a confession into evidence, the state must affirmatively prove that it was not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Roddy, supra. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Roddy, supra; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1023.
Spontaneous and voluntary statements, not given as a result of police interrogation or compelling influence, are admissible into evidence without Miranda warnings even when the defendant is in custody. State v. Robinson, 384 So.2d 332 (La.1980); State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
*772 As to claims that a defendant's mental state precluded a free and voluntary confession, we have held that a defendant's emotional distress is not grounds for rendering a confession inadmissible unless it is so severe that the party confessing is unable to voluntarily do so. Moreover, even when a defendant was suffering some physical harm or claims that his mental capacity was impaired because of his physical condition at the time of the interrogation, his confession is admissible unless he demonstrates that he was impaired to such a degree as to negate his comprehension and render him unconscious of the consequences of what he was saying. State v. George, 37,492 (La.App.2d Cir.9/24/03), 855 So.2d 861, 871-872, and cases cited therein.
The admissibility of a confession is a question for the trial court. State v. Roddy, supra. A trial court's findings following a "free and voluntary hearing" are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.6/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir.1991), writ denied, 584 So.2d 1172 (La.1991). This is due to the trial court's superior opportunity to observe the witnesses and assess credibility. State v. Jones, 96,553 (La.App.2d Cir.1/29/03), 840 So.2d 7, writ denied, XXXX-XXXX (La.10/3/03), 855 So.2d 309.
For support that her statements to the police were not made freely and voluntarily due to her mental state, the defendant relies on the testimony of the jail nurse who saw her the day after her arrest and the psychiatrist who evaluated her over a year after the murder. Testifying in the free and voluntary hearing, Geraldine Goodson, the jail nurse, described the defendant the day after she made her statements to the police as very calm, having a flat expression, and answering questions with one word responses. On cross-examination, Goodson stated that she was able to get the information she needed from the defendant. The trial court found Goodson's testimony as to the defendant's mental state somewhat suspect, since it pertained to the day after the defendant made the statements. Additionally, the trial court believed that the depressed condition described by Goodson did not seem uncommon or unreasonable for a person who had been arrested for murder. Moreover, we note that in her trial testimony, Goodson admitted that, in her experience, 8 out of 10 female inmates display similar behavior when first in jail and that in evaluating the defendant, she found her to be neither depressed, irrational, nor withdrawn.
Dr. Richard Williams testified at trial after the free and voluntary hearing had been conducted and after the trial court had determined that the defendant's statements were admissible. Dr. Williams' evaluation concluded that the defendant had post-traumatic stress disorder; however, neither his evaluation nor his testimony established that she was mentally impaired at the time she made statements to the police about the crime. Additionally, Dr. Williams made clear to the court that his finding that the defendant had a significantly impaired level of functioning applied only to the time of the evaluation when she was suffering post-traumatic stress disorder and on medication for depression. Thus, his testimony had no bearing on the defendant's mental state or comprehension of her rights when she was interviewed by the police investigators in the hours following the murder.
From our review of the record, we find no basis for the defendant's contention that her mental state was impaired when she made statements to the police. The *773 defendant testified that she could recall nothing after the shooting and that she was traumatized by the blood. This convenient claim of traumatic memory loss is not supported by her own rational actions following the murder. She fled the scene, paid her rent with money stolen from the store, hid the remainder of the money, disposed of the gun, and constructed an elaborate story blaming an unidentified man for the shooting before finally claiming it was accidental and leading the police to the hidden weapon and money. The evidence falls far short of proving the type of mental impairment that would render a confession inadmissible.
And we find no basis in the record for her contention that she thought only a recorded statement could be used against her. The uncontradicted testimony of the officers establishes that the defendant was advised of her Miranda rights before each statement, including the spontaneous remarks she made in the police vehicle. There were no threats, promises, or other unlawful inducements. On each occasion before being interviewed and giving a statement, the defendant was carefully advised of her rights, specifically including the warning that anything she said could be used against her in court. Each time she indicated her understanding of her rights and voluntarily waived them as indicated by her signature on the warning and waiver forms. When she decided to request counsel before finally giving a recorded statement, all questions ceased.
The record establishes that the defendant was read her rights multiple times, that she knowingly waived her rights in writing, and that she freely and voluntarily gave statements about the crime to the police. The trial court observed the officers who testified and obviously found them credible. The trial court's determination that the defendant's statements were freely and voluntarily made and admissible at trial is supported by the evidence and will not be disturbed on appeal.
In reviewing the record for error patent, we find that the defendant was not advised at the time of sentencing of the time delays for applying for post-conviction relief. However, it has been held that La. C. Cr. P. art. 930.8(C), which requires the trial court to inform the defendant of the time limitations for filing a post-conviction relief application, is supplicatory language which does not bestow an enforceable right on the defendant. State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, abrogated on other grounds by State ex rel. Olivieri v. State, XXXX-XXXX (La.2/21/01), 779 So.2d 735. By this opinion, we now advise the defendant that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. arts. 914 or 922.

CONCLUSION
Upon finding that the trial court properly determined that the defendant's statements were made freely and voluntarily, we affirm the conviction and sentence.
AFFIRMED.