914 So.2d 1156 (2005)
STATE of Louisiana, Appellee
v.
William Wayne SHUMAKER, Appellant.
No. 40,275-KA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 2005.
*1159 John Cucci, Jr., Shreveport, for Appellant.
Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Donna Frasier, Assistant District Attorneys, for Appellee.
Before STEWART, CARAWAY and MOORE, JJ.
CARAWAY, J.
William Wayne Shumaker ("Shumaker") was originally charged with conspiracy to manufacture a Schedule II controlled dangerous substance ("CDS") and with the crime of creation or operation of a clandestine laboratory for the unlawful manufacture of a CDS under La. R.S. 40:983. A jury convicted him of an attempt of the manufacturing charge. He was sentenced to seven-and-a-half years at hard labor and fined $10,000. He appeals his conviction. We affirm.

Facts
On April 21, 2004, Caddo Parish Sheriff's officers responded to a complaint about the smell of ammonia coming from a trailer on Meriwether Road in Shreveport, Louisiana. Upon their arrival to conduct a "knock and talk," the officers noticed a strong chemical odor like sour or rotten eggs which indicated the manufacture of methamphetamine.
Penny Langley ("Langley"), who was babysitting a child of the owner of the trailer, responded and eventually consented to a search of the premises. Syringes, gas masks, used coffee filters with a chemical odor, plastic containers, rubber gloves, a facial air respirator, a glue gun, the grille of a portable light, and two digital scales were found in the kitchen, a bedroom, and a bathroom of the residence. A 50-gallon tank of suspected anhydrous ammonia, *1160 plastic containers, gas masks, and hoses were also found in an unlocked abandoned trailer located behind the actual residence. Approximately 17 empty cans of starter fluid were discovered in the yard along with a buried black box that contained starter fluid, Morton salt, a gas mask and other plastic containers. No pseudoephedrine was found although blister packs similar to those in which pseudoephedrine is packaged were found in a burn pile in the back yard.
The defendant and Theresa Waddell arrived home while the search was in progress. Deputy James McLamb, II, conducted a pat down search of Shumaker and inquired if the defendant had anything on his person that might hurt the officer. Shumaker told the deputy he had a syringe in his pocket which the officer retrieved. After gaining consent to search Waddell's purse, Corporal Michelle Sanderlin seized a bag with one ounce of methamphetamine and an Excedrin bottle that also contained methamphetamine.
Shumaker was read his Miranda rights at the time of his arrest. He thereafter confessed to Agent Gary Bailey that he had helped a man from Arkansas, named "Tap," cook methamphetamine and that his fingerprints would be found on some of the evidence recovered. A hazardous waste removal company was dispatched to the location for cleanup.
The defense filed a pre-trial motion to suppress arguing that the babysitter did not have authority to consent to the warrantless search of the premises. Shumaker also sought to suppress his arrest statements to the officer. After a hearing on the motion to suppress, the trial court denied the motion and found that the babysitter had authority to consent to the search. Regarding Shumaker's arrest statement, the trial court conducted a free and voluntary hearing on the day of trial after jury selection and ruled that Shumaker's statements were freely and voluntarily given.
At trial, Shumaker argued that the chemical smell was from repairs he made to the sewer system and explained that the materials found on his property were necessary to maintain equipment he owned. He also testified that the syringes belonged to Waddell, his girlfriend.
A jury acquitted Shumaker of the conspiracy charge but convicted him of attempted creation and operation of a clandestine laboratory. Shumaker filed post-trial motions for new trial, post-verdict judgment of acquittal and arrest of judgment and argued that the statute of conviction was unconstitutional. The trial court denied the motions and sentenced Shumaker to seven-and-a-half years at hard labor and a $10,000 fine. This appeal ensued.

Discussion

Right to Counsel
On the day of trial, Shumaker raised concerns about proceeding with his counsel. These concerns were addressed in the court, but his counsel ultimately was retained and conducted the trial. In his first assignment of error, Shumaker argues that he was deprived of "the protections afforded by" the Sixth Amendment as the trial was conducted after he "fired" his lawyer in open court. He contends that "there had been no prior request . . . to upset the jury trial date" and that his attempt to "fire" counsel was not merely dilatory. He cites Fuller v. Diesslin, 868 F.2d 604 (3d Cir.1989), cert. denied, 493 U.S. 873, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989), and Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), to support his claim that he is entitled to a new trial without the necessity of showing prejudice because no hearing was held *1161 regarding his alleged waiver of representation. Shumaker contends that while the trial court stated during the hearing on his motion for a new trial that "the defendant had spoken to the court and had indicated that he was satisfied" with counsel, there is no showing of that statement in the record. He further argues that he had legitimate cause to "fire" his counsel.
U.S. Constitutional Amendment VI, as well as Louisiana Constitution article I, § 13, guarantee the accused in a criminal proceeding the right to assistance of counsel for his defense. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Carpenter, 390 So.2d 1296 (La.1980); State v. White, 325 So.2d 584 (La.1976); State v. Flanagan, 32,535 (La.App. 2d Cir.10/29/99), 744 So.2d 718. The right to counsel may be waived, but the accused must know of the right and intentionally relinquish the right. Faretta v. California, supra. In order to be valid, a waiver of the right to counsel by a defendant must be made knowingly, understandingly and intelligently. Id.
The right to counsel of choice must be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system of which it is a part. State v. Seiss, 428 So.2d 444 (La.1983). Absent a justifiable basis, "[t]here is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications." State v. Leggett, 363 So.2d 434 (La.1978). Once the trial day has arrived, the question of withdrawal of counsel rests largely within the discretion of the trial judge. State v. Seiss, supra; State v. Leggett, supra.
Prior to the free and voluntary hearing on the morning of trial, Shumaker announced to the trial court that he was "firing" his attorney. The trial court instructed defense counsel to talk to the defendant. After the off-record discussion when court resumed, defense counsel requested to declare on the record the defendant's concerns regarding representation. Counsel explained that his client was "concerned about proceeding with the trial" because counsel had earlier been admonished by the court for mistakenly bringing a full can of hazardous starter fluid instead of an empty one to the courthouse for demonstrative purposes. Counsel elaborated, stating, "[M]y client is concerned that since I am potentially in a situation now where I could, you know, have some liability for bringing this into the courthouse, which I did do, that I am not on my cutting edge to try the case."
The trial court then interrupted defense counsel to reassure counsel that he was not going to face any penalty for the incident. The prosecutor confirmed that opinion. The trial court also stated that the incident and admonishment had taken place "outside of the presence of the jury" and that it should not "create problems for the defendant in getting a fair and impartial trial."
When Shumaker asked again to speak, the trial court answered to the defendant's counsel, "I will advise your client that I am kind of at a loss for what reason he needs to address the Court. If it has something to do with some sort of medical problem or what, I mean, maybe you can consult and let me know what's the problem. You can talk right there at the bench, sir, we are in a hearing ...." The defendant and his counsel conferred off-record, and then the record reflects that the hearing and trial proceeded.
After the conclusion of the trial, at the hearing on a motion for new trial, the trial court further addressed allegations of ineffective *1162 counsel and commented about a sidebar with counsel that was held presumably immediately before trial. The trial court stated,
[t]here was some colloquy concerning an issue involving something that occurred during the trial process that had placed a strain on both the Court, the District Attorney and the defense counsel, but that was resolved and after having a Side-bar with counsel, the Court then inquired to the defendant concerning whether or not he was ready to proceed and on the record the defendant answered that he was, in fact, satisfied. He, in fact, was prepared to proceed with counsel, so the Court thinks that we have discharged our duty at that time and we think that it's rather late for Mr. Shumaker to now raise that when he was given an opportunity, if he wanted for us to make a decision on that but he chose to continue on.
A review of the record does not show a direct statement from Shumaker that he was satisfied with counsel and ready to proceed with the pre-trial hearing and trial. Nevertheless, he failed to make any further objections after the incident or as the trial proceeded. The defendant's reliance on Faretta v. California, supra, is therefore misplaced. While Faretta is on point regarding the general issue of representation, it deals primarily with instances in which a defendant wishes to represent himself. A denial of the right to self-representation is per se reversible. Nevertheless in the instant case, the defendant never expressly asked that he be allowed self-representation. He simply indicated that he wanted to fire his counsel. That statement certainly does not reach a clear and unequivocal expression requesting the right to represent oneself as required by Faretta.
Shumaker's reliance on Fuller v. Diesslin, supra under the facts of this case is also unfounded due to factual distinctions between the two cases. Fuller concerned the arbitrary denial of a defendant's motion for admission pro hac vice of two out-of-state lawyers to try his case and the issue of whether the right to counsel pro hac vice is included within the right to counsel of choice. Such a factual scenario is not present in this matter. Moreover, while the court there held that the arbitrary denial of such a request by a defendant is per se reversible, the court also affirmed that the defendant's right to choose his own counsel must be balanced against the fair and proper administration of justice. Thus, the defendant's choice of counsel is circumscribed by a trial court's institutional obligation to safeguard the integrity of the proceedings before it.
Shumaker did not request a motion for continuance when he asked to "fire" his attorney so as to give some suggestion of his continued dissatisfaction with counsel. Shumaker makes no contention on appeal that he was ineffectively represented.
From the record and the trial court's statements at the hearing on the motion for new trial, the defendant apparently agreed to proceed with trial with the same counsel. After the sidebar discussion between the defendant and his lawyer, there were no further attempts to dismiss counsel. While any further discussions between the trial court, the defendant, and his counsel should have been more clearly stated on the record, the defendant fails to show that his attempt to "fire" counsel and the subsequent continuation of trial with counsel after a sidebar can be construed as an arbitrary denial of his right to choice of counsel. On these grounds, we find this assignment of error to be without merit.

*1163 Constitutionality of Statute

Shumaker next argues that, La. R.S. 40:983, his statute of conviction, is "overbroad, vague and otherwise unlawful" because the conduct proscribed by the statute does not provide objective standards and encompasses a wide range of innocent activities by the public in violation of Louisiana law. Shumaker argues that the items for manufacturing a CDS indicated by the statute "can be found around anybody's house."
La. R.S. 40:983 states:
A. Creation or operation of a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance is any of the following: (1) The purchase, sale, distribution, or possession of any material, compound, mixture, preparation, supplies, equipment, or structure with the intent that it be used for the unlawful manufacture of a controlled dangerous substance. (2) The transportation or arranging for the transportation of any material, compound, mixture, preparation, supplies, or equipment with the intent that such material, compound, mixture, preparation, supplies, or equipment be used for the unlawful manufacture of a controlled dangerous substance. (3) The distribution of any material, compound, mixture, preparation, equipment, supplies, or products, which material, compound, mixture, preparation, equipment, supplies, or products have been used in, or produced by, the unlawful manufacture of a controlled dangerous substance. (4) The disposal of any material, compound, mixture, preparation, equipment, supplies, products, or byproducts, which material, compound, mixture, preparation, equipment, supplies, products, or byproducts have been used in, or produced by, the unlawful manufacture of a controlled dangerous substance.
B. It shall be unlawful for any person to knowingly or intentionally create or operate a clandestine laboratory for the unlawful manufacture of a controlled dangerous substance.

* * *
In State v. Hair, 00-2694 (La.5/15/01), 784 So.2d 1269, the Louisiana Supreme Court reviewed the applicable law with regards to challenges to statutes as being unconstitutionally vague:
In determining the constitutionality of a statute, we must follow the basic rules of statutory construction. A statute is presumed to be constitutional, and the burden of clearly establishing unconstitutionality rests upon the party who attacks the statute. A statute should be upheld whenever possible. Louisiana criminal statutes must be "given genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." La. R.S. 14:3.
A statute is unconstitutionally vague if an ordinary person of reasonable intelligence is not capable of discerning its meaning and conforming his conduct thereto. This occurs where a statute either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. In such instances, the statute violates due process of law. A criminal statute must provide adequate standards by which a party may be determined to be guilty or not guilty so that an individual's fate is not left to the unfettered discretion of law enforcement.
Accordingly, under the "void-for-vagueness" doctrine, a criminal statute must meet two requirements to satisfy due *1164 process: (1) adequate notice to individuals that certain contemplated conduct is proscribed; and (2) adequate standards for those charged with determining the guilt or innocence of the accused. La. Const. art. 1 § 13. Broad language is not in itself vague, particularly where it is clear that the legislature intended to make criminal all acts of a certain kind. 784 So.2d at pp. 1273-1274. (Citations omitted.) See also State v. Lam, 36,862 (La.App. 2d Cir.2/11/03), 837 So.2d 749, writ denied, 03-0945 (La.10/3/03), 855 So.2d 308.
The contested statute[1] states that it is unlawful to "knowingly or intentionally create or operate" a laboratory for the illegal manufacture of a CDS and lists four groups of activities that may amount to the crime of creation or operation of a clandestine laboratory. La. R.S. 40:983. The first group describes activities encompassing preparatory work for the manufacture of methamphetamine. See subsection A(1) of the statute. This provision deals with possession of materials, compounds and equipment, "with the intent" that they be used for the manufacture of a CDS. In the absence of qualifying provisions, the term "intent" has reference to general criminal intent, La. R.S. 14:11, and such general criminal intent is present when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences of his act or failure to act. La. R.S. 14:10.
The statute is presumed to be constitutional and should be upheld whenever possible. To prove that the law is unconstitutional, the defendant is required to show that an ordinary person of reasonable intelligence could not understand and follow the law. As noted above, broad language is not in itself vague, particularly where it is clear that the legislature intended to make criminal all acts of a certain kind.
The most limiting factor of the defined crime in this case is its requirement for proof of the unlawful manufacture of a CDS. Regardless of the fact that many common household items may be possessed by a person accused of this crime, the process of manufacturing, which the state's expert witness described in elaborate detail in this case, entails a complicated course of conduct. Such conduct which, beyond a reasonable doubt, demonstrated the intent to manufacture the CDS was shown to be much more than possession of common household items. Thus, the illegal activity proscribed by the statute is narrow and gives adequate notice to those who would engage in such manufacturing activities that the conduct is proscribed. Therefore, this portion of Shumaker's argument is without merit.

Rejection of Conspiracy Conviction
As part of his constitutionality argument, Shumaker contends that the jury's acquittal verdict on the conspiracy charge effectively rejected the state's proof of the element of specific intent on the attempt charge. This argument is more appropriately addressed as a separate assignment of error which also fails.
The jury's finding that Shumaker did not conspire to manufacture methamphetamine does not conflict with the finding that he attempted to create or operate a clandestine laboratory with the intent to manufacture methamphetamine. Although specific intent is an essential element of the conspiracy, and the definition of attempt,[2] a conspiracy differs from the *1165 attempt conviction in this instance in that it is a separate and distinct offense from the completed crime. The conspiracy involves the additional element of combination or agreement of purpose between two or more persons which also differentiates it from the crime of conviction. See Reporter's Comment La. R.S. 14:26. Thus, the rejection of the conspiracy charge does not effectively preclude a finding of requisite intent on the attempt charge. Shumaker's contrary argument is meritless.

Motion to Suppress
Shumaker also argues that the district court erred in denying his motion to suppress because the babysitter, Penny Langley, did not have proper authority to consent to a search of the residence and could not have given authority to search the trailer behind the house. Shumaker also argues that agents were already conducting a search prior to obtaining consent when they took a cigar near the front door which they suspected to contain marijuana.
It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. State v. Raheem, 464 So.2d 293, 297 (La.1985); State v. Crews, 28,153 (La.App. 2d Cir.5/8/96), 674 So.2d 1082, 1084. Oral consent to a search is valid. State v. Crews, supra. Consent is valid when it is freely and voluntarily given by a person who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); State v. Bodley, 394 So.2d 584, 588 (La.1981); State v. Owens, 480 So.2d 826, 830 (La.App. 2d Cir.1985), writ denied, 486 So.2d 748 (La.), cert. denied, 479 U.S. 840, 107 S.Ct. 145, 93 L.Ed.2d 87 (1986). This common authority stems not so much from one's property interest, "but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." United States v. Matlock, supra, 94 S.Ct. at 993, fn. 7. When the facts do not support a finding of actual authority, a search is reasonable within the meaning of the Fourth Amendment if the consent giver apparently has actual authority. Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).
While a valid consent search is a recognized exception to the warrant requirement, the burden is on the state to prove that the consent was given freely and voluntarily. Necessarily, voluntariness is a question of fact to be determined by the trial court under the facts and circumstances of each case, which determination is to be given great weight upon appeal because of that court's opportunity to observe witnesses and assess credibility. State v. Edwards, 434 So.2d 395 (La.1983); State v. Jennings, 39,543 (La.App. 2d Cir.3/2/05), 895 So.2d 767; State v. Paggett, 28,843 (La.App. 2d Cir.12/11/96), 684 So.2d 1072. A trial court's decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence *1166 clearly favors suppression. State v. Normandin, 32,927 (La.App. 2d Cir.12/22/99), 750 So.2d 321, 324, writ denied, 00-0202 (La.9/29/00), 769 So.2d 550; State v. Williams, 98-1006 (La.App. 5th Cir.3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118. In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
Agent Perry, Penny Langley, the babysitter, and her stepmother, Shirley, testified at the hearing on the motion to suppress. In relevant part, that motion addressed the places searched on the premises and the evidence found after Langley consented to the search.
Perry testified that he accompanied two other officers to the address after receiving "a call in reference to a strong smell of ammonia in the area." Perry found on the step near the front door a partially-smoked cigar with a "green substance inside, what appeared to be marijuana." Perry testified that the search was conducted because of the cigar and "the calls from a concerned citizen." He stated that Deputies Kevin Dunn and Glenn Cornell made initial contact with Langley and approximately five minutes later, Perry talked to her about a consent to search form.
According to Perry, Penny said that she "had been staying there for the past few days and that she lived there  she stayed there occasionally" and that she was babysitting the two-year-old son of the couple who lived there. Perry did not remember "her saying that she could not" consent to the search. He also stated that no one coerced her to sign the consent form, that he read the form to her and asked if she understood it, and that he told her she had a right not to sign and that "[i]t was totally up to her." Perry testified that Langley signed the form and that a "large duffel bag with some women's clothing in it" was found in the living room. According to Perry, Langley told the officers that "those were her clothes and she had been staying at the residence." Also according to Perry, Langley stated that she stayed over when "she was having problems with her father" and that she slept in one of the bedrooms. Perry stated that upon their arrival, Shumaker and his girlfriend never requested that the search be stopped or asked to withdraw consent to search.
Penny Langley testified that she had cared for the defendant's son "quite a few times" before the incident and that she had not stayed at the house the night before the search. She had previously stayed overnight two or three times to babysit and testified that the duffel bag contained clothes that the defendant's girlfriend had given her a few days before. Langley stated that the only reason she went to the door was because she was following the child and that she told the agents that she "wasn't supposed to open the door for anyone at that time." She testified that the agents were not in uniform and that she told Perry she could not sign the consent form because she did not live there. The witness stated that the conversation continued for "[a]bout an hour" or longer and that she only signed the form because Perry "was getting angry" and put pressure on her to sign. She further explained that she stayed at the couple's house the night after they went to jail because "[t]hey had asked me to stay there and watch the house for them." She admitted to having access to the entire trailer and to going into several rooms in the house with the child.
*1167 Shirley Langley testified that her stepdaughter was at Shumaker's residence that day to babysit. She believed Langley had been at her house the night before the incident. Shirley testified that Langley cared for the defendant's child at his residence "quite often."
The courts have held that an adult babysitter does have an ability to voluntarily consent to a search of the common areas of the premises. United States v. Thomas, 120 F.3d 564 (5th Cir.1997), cert. denied, 522 U.S. 1061, 118 S.Ct. 721, 139 L.Ed.2d 660 (1998); United States v. Dearing, 9 F.3d 1428 (9th Cir.1993); State v. Boyd, 90 Ohio Misc.2d 20, 695 N.E.2d 843 (1998). But cf. United States v. Corral, 339 F.Supp.2d 781 (W.D.Texas 2004) (domestic employee who worked as a maid and babysitter at the house approximately two days a week was found not to have authority to consent to search).
In the instant case, Penny Langley was the adult caretaker for the couple's two-year-old son and admittedly had access to the entire trailer. She had apparently stayed at the residence often. The caretaker involved in United States v. Thomas, supra, had no more connection with the property than Langley did, and the Fifth Circuit found his consent to search valid. Because the present search of the house appears to have been primarily limited to common areas (kitchen, bathroom, yard), Langley would have had authority or at least apparent authority to give consent to search those areas.
Regarding the voluntariness of Langley's consent, it is clear that the trial court rejected Langley's testimony and accepted Perry's statement that Langley freely and voluntarily gave him consent to search the house. Langley's signed consent form certainly weighs against her testimony. Such credibility determinations are given great weight and will not be disturbed on appeal. If believed, the record is sufficient to establish that Penny Langley freely gave written consent to Perry to search the premises without being coerced.
Shumaker's argument regarding the officers conducting a search prior to consent is also without merit. Clearly, Perry found the marijuana cigar on a step near the front door in a place where he had the legal right to be. An exception to the warrant requirement is the plain view exception. Objects falling into plain view of an officer who has a right to be in the position of observation are subject to seizure and admissible in evidence. Here, such independent grounds existed for Perry's seizure of the cigar which did not invalidate the subsequent consensual search of the premises.
Finally, we find the search of the trailer justified under the exigent circumstances exception to the warrant rule. Warrantless entries into private premises are invalid in the absence of exigent circumstances. State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923. The United States Supreme Court has defined exigent circumstances as "a plausible claim of specially pressing or urgent law enforcement need." Illinois v. McArthur, 531 U.S. 326, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001). Exigent circumstances may arise from the need to prevent the offender's escape, to minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and to preserve evidence from destruction or concealment. State v. Brisban, supra. The existence of ammonia in a residence has been held to constitute exigent circumstances due to its explosive nature. State v. Guidry, 03-625 (La.App. 5th Cir.1/27/04), 866 So.2d 944.
In this case, the officers searched the residence after gaining consent from an *1168 adult caretaker who told them that she stayed there overnight. Perry testified that there was a strong chemical odor in the yard and that it smelled like ammonia which is usually associated with the manufacture of methamphetamine. He also found a partially smoked blunt on the front step of the residence. The other officers at the scene also testified about the chemical smell at trial. Under these circumstances, clear public safety concerns associated with the illegal manufacture of methamphetamine existed for the officers' entrance into the trailer without a warrant. Additionally, the risk of destruction of evidence was also present in the trailer considering that the evidence found in the kitchen, bedroom and bathroom of the residence could be easily associated with drug manufacturing. On these grounds, we find that the warrantless search was lawful and the trial court did not err in denying the motion to suppress.

Bad Acts Evidence
In this final assignment of error, Shumaker argues that evidence of the syringe found in his pocket during a patdown search was inadmissible because it "was not part of the crime of creating a clandestine laboratory or part of a conspiracy to manufacture a controlled dangerous substance." Nevertheless, the defendant failed during trial to make a contemporaneous objection to the admission of the syringe or references made to it. Thus, under La. C. Cr. P. art. 841, Shumaker waived any objection to the introduction of this evidence at trial and is precluded from raising this issue on appeal.

Conclusion
For the foregoing reasons, Shumaker's conviction and sentence for the crime of attempted creation or operation of a clandestine laboratory for the unlawful manufacture of a CDS in violation of La. R.S. 40:983 are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] As mandated by La. R.S. 13:4448, notice has been sent to the attorney general regarding this assignment. At the time of this opinion, no response had been received.
[2] La. R.S. 14:27 provides:

A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilt of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose....