STEWART, J.
|2The defendant, Larry John Thompson, entered a Crosby[1] plea to one count of possession with intent to distribute a Schedule II controlled dangerous substance, namely cocaine, in violation of La. R.S. 40:967(A). He reserved his right to appeal the trial court’s denial of his motion to suppress evidence. He was subsequently adjudicated a fourth-felony offender and sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The court fined Thompson $3,000.00 plus court costs, in default of which defendant was sentenced to an additional 60 days in parish jail. The defendant now appeals, urging two assignments of error. Finding merit in one of the assignments raised, we reverse the denial of the defendant’s motion to suppress, vacate his conviction and sentence, and remand the matter to the district court for further proceedings.
FACTS
The defendant was charged by bill of information with one count of possession with intent to distribute a Schedule II controlled dangerous substance. The charge arose out of the defendant’s arrest on May 29, 2008, at the Levingston Motel in Shreveport, Louisiana. Law enforcement encountered the defendant while executing a search warrant on rooms 31 and 37 of the motel.[2] In the process of being interviewed by police, the defendant admitted to having narcotics in his truck and executed a consent form allowing law enforcement to search for them.
On October 8, 2008, the defendant filed a motion seeking to suppress the cocaine as having been obtained in violation of his constitutional right against unreasonable searches. The motion asserted that the defendant’s initial detention and pat-down was unlawful because he was not occupying either of the rooms which were the subject of the search warrant. Furthermore, the consent to search was obtained as a result of law enforcement’s continued detention of the defendant after the initial pat-down yielded no threat to officer safety.
|sThe motion to suppress was initially heard on April 1, 2009. The state relied solely on the testimony of Agent Shawn Parker. Agent Parker testified that on the date in question, members of the Shreveport Police Department’s Special Response Team (“SRT”) converged on the Levingston Motel in the Allendale neighborhood, a location regarded by law enforcement as one of “high crime” for narcotics and prostitution. The SRT was there to execute search warrants on Rooms 31 and 37. Agent Parker’s role was part of a secondary team which pro *997 vides for the entry team’s safety by dealing with individuals outside the rooms being entered by SRT members. Agent Parker testified that as he arrived, the door to Room 81 was open and two black males were standing outside. The defendant was in the doorway but had started to walk away from the room. As defendant was walking away, officers ordered everybody to get on the ground, where all three individuals were handcuffed for officer safety. All three detained individuals were then helped to their feet and read their Miranda rights.
The defendant was asked to produce his driver’s license and was patted down for weapons. The pat-down yielded no weapons. Agent Parker asked the defendant his reason for being in Room 31 and how he had arrived. The defendant said he was visiting a friend and pointed to his truck parked in front of the “apartments.” Agent Parker testified that the truck was located right next to a vehicle parked in front of Room 31. When the defendant was asked if he had anything illegal in the vehicle, the defendant admitted that he had a gun. Parker testified that the defendant’s handcuffs were removed at this point.
Agent Parker pulled the defendant aside to ask him more questions about the potential presence of a gun in his truck given the volatile situation. The defendant then allegedly admitted to the officer that he was a convicted felon and was not supposed to have a gun. When Agent Parker asked if he could retrieve the gun, the defendant stated he didn’t want to get in trouble and started to deny that there was a gun. Upon further questioning, however, the defendant also admitted that he had crack cocaine in the truck. Parker informed the defendant that because of his admissions, Parker could not “just walk away.” Parker again asked to search the vehicle and the defendant consented after Parker assured him that he did not intend to | ¿impound the vehicle. The defendant signed a consent to search form before the search took place and then opened the truck for Parker. The defendant then entered his truck and from the center armrest of the bench seat retrieved a clear plastic bag containing five individually packaged rocks of crack cocaine. The defendant was arrested and charged with possession with intent to distribute.
On cross-examination, Agent Parker explained that the defendant continued to be detained after the initial pat-down because it was not clear what connection, if any, the defendant had to the rooms on which the search warrants were being executed. Parker also testified that the defendant was not handcuffed at the time he retracted his admission about having a gun. However, Agent Parker asserted that the defendant was being detained and would not have been free to leave. In fact, Agent Parker testified that he did not return the defendant’s driver’s license until the defendant was signing the consent to search form. At the time the written consent form was signed, Agent Parker stated that the defendant’s handcuffs had been removed for approximately five to ten minutes.
The defendant called Agent Steve McKenna to testify about his participation as a member of the SRT on the date in question. McKenna testified that he was responsible for entering Room 31 and that as he did so, he observed the defendant coming “from the front door of the room” and traveling south. Agent McKenna ordered the defendant to “get on the ground,” which the defendant did. Agent McKenna then entered Room 31 and other members of the SRT were left to deal with the defendant.
*998 The defendant also called Robert Coll-eprn, a resident of the Levingston Motel, who testified that he was with the defendant and the defendant’s girlfriend in Room 29 just prior to the arrival of law enforcement. Colleprn had just completed, some television repairs in the room and was walking out behind the defendant. The defendant took a left as he exited the room and headed in the direction which would take him past Room 31. The police arrived shortly thereafter and due to a partition between Room 29 and the rooms to the left, Colleprn witnessed nothing further regarding the initial interaction between officers and the defendant. R Coll-eprn did see the defendant in handcuffs and later saw him without handcuffs.
The defendant testified that he had exited Room 29 just prior to his detention by officers. He stated that his girlfriend lived in Room 29, and he was heading toward the trash to search for DVDs which patrons of the motel discard from time to time. He had just passed Room 31 when officers came in contact with him. He stated that surveillance video would confirm his testimony regarding these facts. The defendant alleged that when he was reluctant to consent to a search of his vehicle, Agent Parker threatened to summon a K-9 unit and that if it detected anything, the vehicle would be impounded and the defendant’s apartment would be searched. He also claimed that his handcuffs were removed only so that he could sign the consent form.
At the conclusion of the initial hearing, the trial judge asked about the “video surveillance” mentioned by the defendant during his testimony and whether there was an actual recording of it. Because the surveillance video was not part of the search operation, the parties were not certain as to the existence or content of such a recording, but at the trial court’s request, they committed to investigate the issue further. Two weeks later, the hearing resumed at which time the surveillance video was produced. While its origin is not entirely clear, the defendant alleges that the video was obtained in response to an internal affairs complaint which he had made with the Shreveport Police Department. The original source and/or custodian of the recording is not clear from the record.
The recording was played in open court as the defendant testified to what it showed. Also introduced were three photographs allegedly taken by the defendant. The first photograph depicts the defendant’s Ford F-150 truck parked in front of Room 27 of the motel, which he testified is where it was parked on the date of his arrest. The second photograph depicts Rooms 30 and 31, with a white Cadillac parked in front of Room 30, which the defendant indicated was also parked in the same location on the day of his arrest. The last photo depicts the doors to Rooms 32 and 33 and the area in between them, which is where defendant claims he was located when the SRT first ordered him to the ground.
IfiThe surveillance video and the photographs taken by the defendant, when compared to each other, indicate that the defendant’s Ford F-150 truck is parked in front of Room 27 at the time of the SRT’s operation. Prior to the SRT operation, the video depicts an individual, wearing clothing matching the description defendant provided of his attire on the date of his arrest, leaving Room 29 on several occasions and going to the defendant’s truck before returning to Room 29. As the first vehicle of the SRT pulls into the parking lot, the individual is seen emerging again from Room 29. When the individual reaches the end of the brick wall which separates the door of Room 29 from *999 the door to Room 30, he makes a 90-degree turn to his left and starts walking parallel to the facade of the motel in the direction of Rooms 30 and 31. At this point in the video, the defendant disappears from view as a result of vegetation which obstructed the camera’s view of Rooms 30, 31, 32, and 33, where the defendant was initially detained by law enforcement. Officers are seen moving in the direction of where the viewer can only speculate the door to Room 31 is located and where the defendant might have been standing had he kept walking at the same pace when he disappeared from the camera’s view. A short time later, an officer is seen escorting the defendant back into the camera’s view and sitting him in front of Room 29. At this point the defendant appears to be handcuffed. The video ends before the defendant’s handcuffs are removed and before any search is conducted of what is presumed to be the defendant’s truck.
The court rendered its ruling denying the motion to suppress on April 22, 2009. The trial judge found that the defendant was coming out of Room 29 and would have been somewhere in the vicinity of Room 31 when apprehended. The court indicated that it would not reach the question of whether the initial detention was legal or not, because the defendant’s subsequent consent was freely and voluntarily given and, therefore, the narcotics were obtained pursuant to a valid search. Subsequently, the defendant entered a Crosby plea of guilty to possession with intent to distribute a Schedule II Controlled Dangerous Substance (cocaine), reserving his right to seek appellate review of the denial of his motion to suppress. The state filed a habitual offender bill of information and on February 4, 2010, the defendant was adjudicated a fourth-felony habitual 17offender and sentenced to life imprisonment with credit for time served plus a $3,000.00 fine. The trial court denied the defendant’s subsequent motion for a downward departure from the mandatory life sentence. The defendant now appeals, challenging the denial of his motion to suppress evidence and the severity of his enhanced sentence as constitutionally excessive.
LAW AND DISCUSSION

Motion to Suppress

In the defendant’s first assignment of error, he asserts that the trial court erred in denying his motion to suppress evidence in violation of his constitutional right to be free from unreasonable search and seizure. More specifically, he argues that the surveillance video contradicts the officers’ testimony as to the room from which defendant was emerging. Therefore, he asserts that his initial detention was illegal and that the consent to search was obtained during the continuation of that illegal detention, thereby invalidating the consent.
The Fourth Amendment of the Constitution of the United States guarantees the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures. This amendment is made enforceable against the states through the Fourteenth Amendment. Article I, Section 5 of the Louisiana Constitution guarantees the right of the people to be secure in their person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. A warrant-less search is unreasonable unless the search can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Tatum, 466 So.2d 29 (La.1985); State v. Ledford, 40,318 (La.App.2d Cir.10/28/05), 914 So.2d 1168.
*1000 Consent to search is one of the recognized exceptions to the warrant requirement, where the consent is freely and voluntarily given by a person who possesses common authority over or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). When the state relies on consent to justify a warrantless search, it has the burden of proving the consent was freely and voluntarily given. Voluntariness of consent is a question of fact which the trial judge must determine based on a totality of |sthe circumstances. State v. Edwards, 434 So.2d 395 (La.1983); State v. Jennings, 39,543 (La.App.2d Cir.3/2/05), 895 So.2d 767, writ denied, 05-1239 (La.12/16/05), 917 So.2d 1107; State v. Paggett, 28,843 (La.App.2d Cir.12/11/96), 684 So.2d 1072. If consent to search is obtained after an illegal detention or entry, the consent is valid only if it was the product of free will and not the result of exploitation of the previous illegality. Among the factors considered in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the police officers adequately informed the individual that he need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Owen, 453 So.2d 1202 (La.1984).
The Louisiana legislature codified the standard for investigatory stops and pat-downs for officer safety as set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), in La. C. Cr. P. art. 215.1. In regard to an investigatory stop, Subsection A states that “A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.”
In determining whether the police possessed the requisite “minimal level of objective justification” for an investigatory stop based on reasonable suspicion of criminal activity, United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)), reviewing courts “must look at the ‘totality of the circumstances’ of each ease,” a process which “allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that ‘might well elude an untrained person.’ ” State v. Temple, 2002-1895 (La.9/9/03), 854 So.2d 856 (quoting United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002) internally quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Reasonable suspicion to justify an investigatory stop under Terry, supra., is less than probable cause.
A trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression. State v. Whitehead, 42,677 (La.App. 2 Cir. 4/2/08), 980 So.2d 243, writ denied, 2008-1096 (La.1/9/09), 998 So.2d 713; State v. Normandin, 32,927 (La.App. 2 Cir. 12/22/99), 750 So.2d 321, writ denied, 00-0202 (9/29/00), 769 So.2d 550. When reviewing a motion to suppress, it is important to determine who has the burden of proof and the proper standard of review. Whitehead, supra. When the con *1001 stitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D); State v. Johnson, 32,384 (La.App.2d Cir.9/22/99), 748 So.2d 31.
The entire record, including the testimony at trial, is reviewable for determining the correctness of a ruling on a pre-trial motion to suppress. State v. Young, 39,456 (La.App. 2 Cir. 3/2/05), 895 So.2d 753; Whitehead, supra. Great weight is placed upon the trial court’s determination, because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Crews, 28,153 (La.App. 2 Cir. 5/8/96), 674 So.2d 1082, citing State v. Jackson, 26,138 (La.App. 2 Cir. 8/17/94), 641 So.2d 1081. Accordingly, this court will review the district court’s ruling on a motion to suppress under the manifest error standard in regard to factual determinations, as well as credibility and weight determinations, while applying a de novo review to its findings of law. State v. Hemphill, 41,526 (La.App. 2 Cir. 11/17/06), 942 So.2d 1263, citing State ex rel. Thibodeaux v. State, 2001-2510 (La.3/8/02), 811 So.2d 875.
In the present case, the legality of the detention is unclear. The surveillance video, viewed without regard to any of the witnesses’ testimony, does not in and of itself depict the investigatory stop of the defendant as suspect. It shows that the defendant was in the general vicinity of one of the rooms which was the subject of a warrant to search for narcotics. A law enforcement officer may stop a person in a public place |10whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions. La. C. Cr. P. art. 215.1(A). The officers involved in executing the search warrant in this case testified that the motel was one where narcotics and prostitution were prevalent and where many arrests had previously been made. We must presume that citizens are law abiding, even those in public housing developments and other targeted high crime areas. State v. Temple, supra. Nevertheless, the officers here are permitted to question the defendant’s connection to the room and/or his potential to pose a danger to officer safety.
At first glance, the state appears to have proven the “reasonable and articulable suspicion” requirement that would have justified the defendant’s detention for an investigatory stop. Further, his subsequent consent to the search of his truck would appear to have been freely and voluntarily given.
While reviewing the record, we observe that the “reasonable and articulable suspicion,” which would have otherwise justified an investigatory stop, was based on facts related by Agent Parker, whose “suspicion” is the only one of relevance. Even though Agent Parker’s encounter with the defendant occurred during daylight hours where he had excellent visibility, he related facts that clearly contradicted the actual facts depicted in the surveillance video. For instance, Agent Parker testified the defendant was leaning in the doorway of Room 31, whereas the surveillance video clearly shows him coming out of Room 29, as testified by the defendant. The defendant was never in the doorway of room 31; he was actually headed toward an area away from room 31 when the officers arrived at the motel. In order to reach room 31, the defendant had to walk around the partition between rooms 29 and 31. It is unlikely that he could have reached Room 31 in time to appear to arriving officers as *1002 though he was in its doorway. The surveillance video supports this reasoning and is consistent with the defendant’s testimony. Second, the defendant’s truck is not parked in front of or even relatively near to Room 31 as testified to by Agent Parker. Rather, it is parked in front of Room 27. Lastly, Agent Parker’s testimony that defendant was ten feet away from his truck is also contradicted by the surveillance video, since the truck was actually quite a number of parking |nspaces down from where the defendant stood. There were also several cars and a metal barricade between the defendant and the truck. These were all factors cited by the state as justification not only for the initial stop, but also for the post-pat-down questioning of the defendant as to the possible contents of his truck.
Taking into consideration Agent Parker’s erroneous yet certain recollection of the facts which he presumably relied on in arriving at “a reasonable and articulable suspicion” for an investigatory stop of the defendant, the trial court erroneously disregarded the legality of the initial detention and concluded that the state met its burden of proving that the warrantless search was justified as an exception to the warrant requirement of the Fourth Amendment.
The defendant was stopped, handcuffed, patted down for weapons, and questioned. When Agent Parker initially questioned the defendant, he was able to determine the defendant’s name, address, and an explanation of his actions, and the fact that he was clearly not an occupant of the rooms that were the subject of the search warrant. Further, Agent Parker’s pat-down of the defendant yielded no weapons. Therefore, the defendant should have been released from his detention. For reasons unknown, Agent Parker kept the defendant in handcuffs and investigated further as shown by testimony:
Q: Did you ask him anything else?
A: I asked him how he got there. He pointed to a truck, a blue and white Ford pickup truck that was parked almost directly in front of the apartments. I asked him if he had anything illegal in the vehicle?
At this point in the investigation, the routine investigatory stop transitioned into an illegal detention. Based on the evidence, the trial court should have determined that the “reasonable and articulable suspicion,” which would have otherwise justified an investigatory stop, was based on Agent Parker’s testimony that clearly contradicted the surveillance tape. Pairing this determination with the fact that Agent Parker further investigated the defendant when he should have released him from the detention, the trial court should have ruled that the initial detention was illegal.
112Because of the defendant’s illegal detention, we cannot agree with the trial court’s erroneous conclusion that the subsequent consent was freely and voluntarily obtained. As noted above, consent obtained after an illegal detention is only valid if it was the product of free will and not the result of exploitation of the previous illegality. Agent Parker’s testimony that the defendant was not free to leave at the time he provided all the incriminating information and was not given his driver’s license until the consent to search forms were signed supports a finding that the consent was not sufficiently attenuated from the arguably illegal detention so as to be a product of a free will. The record is absent of any indication that Agent Parker expressed to the defendant that he had the option of not giving consent to search the vehicle.
*1003 Finding merit in this assignment of error, we reverse the denial of the defendant’s motion to suppress, vacate the guilty plea and sentence and remand for further proceedings. Based on our decision regarding this assignment of error, there is no need to address the defendant’s assignment of error regarding the exces-siveness of the sentence imposed.
CONCLUSION
For the foregoing reasons, we reverse the denial of the defendant’s motion to suppress, vacate his conviction and sentence and remand for further proceedings.
REVERSED, VACATED AND REMANDED.
CARAWAY, J., concurs with written reasons.

. State v. Crosby, 338 So.2d 584 (La.1976).

. The state did not show that the defendant or his girlfriend was a subject or party of interest in relation to the search warrant.