363 So.2d 434 (1978)
STATE of Louisiana
v.
Michael A. LEGGETT.
No. 61766.
Supreme Court of Louisiana.
October 9, 1978.
*436 John M. Lawrence, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise S. Korns, Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Defendant, Michael A. Leggett, was charged by bill of information with armed robbery in violation of R.S. 14:64 and was appointed counsel from the Orleans Indigent Defenders Program. On the day of trial, defense counsel filed a motion for continuance to permit the defendant to retain private counsel and a motion to withdraw as counsel of record because of disagreement between defendant and counsel concerning the manner and method of defense. The court denied both motions but granted defendant's request to represent himself with defense counsel as an adviser. Defendant was tried before a jury of twelve persons which found him guilty of armed robbery, and the court sentenced him to forty-nine and one-half years at hard labor as an habitual offender. On appeal, defendant relies on six assignments of error for reversal of his conviction and sentence.
On August 25, 1977 defendant, allegedly armed with an air pistol, robbed the Liberty Bank at 3939 Tulane Avenue in New Orleans. Defendant showed his gun to the bank teller, demanded money, and then jumped over the counter to take it. Taking the teller as a hostage, defendant left the bank. Outside the bank defendant abandoned the money bag when a tear gas device placed in the bag with the stolen money exploded. Defendant proceeded on foot a short distance and was apprehended by two United States Marshals and members of the New Orleans Police Department.

Assignments of Error Nos. 1 and 2
Defendant contends that the trial court erred when it denied defense motions to withdraw as counsel and motion for continuance. The motion for continuance alleged that defendant wanted time to retain an Ohio attorney as private counsel. The motion to withdraw alleged that defendant and his counsel were in opposition as to the manner and methods of defense.
Both the federal and state constitutions provide that the accused has the right to counsel of his own choosing to defend him on a criminal charge. However, this right does not permit arbitrary action which obstructs orderly procedures in the courts. State v. Dickerson, 353 So.2d 262 (La.1977); State v. Mackie, 352 So.2d 1297 (La.1977). Rather the right to choose one's attorney is a right to be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system. There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications to the orderly trial of cases. Once the trial day has arrived, the question of withdrawal of counsel rests largely within the discretion of the trial judge. State v. Cousin, 307 So.2d 326 (La. 1975); State v. St. Amand, 274 So.2d 179 (La.1973). This courthas frequently upheld the trial court's denial of motions for continuances or withdrawal of counsel made on the day of trial when defendant is dissatisfied with his present attorney but had ample opportunity to retain private counsel. State v. Anthony, 347 So.2d 483 (La.1977); State v. Hegwood, 345 So.2d 1179 (La.1977); State v. Wiggins, 337 So.2d 1172 (La.1976); State v. Alexander, 334 So.2d 388 (La.1976); State v. Austin, 258 La. 273, 246 So.2d 12 (1971).
In the instant case, when the trial judge denied defense motions he considered the amount of time which had elapsed from the filing of the bill of information to the trial date.[1] Also, the trial record indicates:
*437 that the Ohio attorney neither appeared in court to verify his retention nor communicated with the trial judge in any way; that defendant's court appointed counsel contacted the Ohio attorney twice before trial, but he refused to speak to defense counsel over the phone; that defendant's court appointed counsel filed pre-trial motions on defendant's behalf and was fully versed with the facts of the case; that the motions for continuance and to withdraw were made on the day of trial; and that the Ohio attorney neither made an appearance nor contacted the court during the trial, or motion for new trial, or on appeal.
In State v. St. Amand, 274 So.2d at 189, defense counsel filed a motion to withdraw on the day of the trial because irreconcilable difference had become manifest between counsel and defendant over the conduct of the defense. Noting that in a per curiam the trial judge had stated his familiarity with the defense counsel's ability, his diligence and thorough preparation, this court upheld the trial judge's denial of the motion to withdraw. In the present case, counsel and defendant were apparently at odds over the propriety of a plea of not guilty by reason of insanity in the absence of any supporting evidence;[2] however, when defendant was permitted to conduct his own defense, he never submitted a plea or evidence of insanity.
Assignments of Error Nos. 1 and 2 lack merit.

Assignment of Error No. 3
Defendant contends that the trial court erred in denying his oral motion before jury selection to wear civilian clothing at the trial and in forcing him to trial wearing prison clothing. Defendant relies on State v. Tennant, 262 La. 941, 265 So.2d 230 (1972) and State v. Johnson, 343 So.2d 155 (La.1977) for the proposition that to try a man in prison clothing infringes on the presumption of innocence and the defendant is required to be tried free of the stigma of prison clothes, because prison attire might unduly connote guilt.[3]
*438 In the past this court has found that the accused must prove by clear and convincing evidence that his prison attire deprived him of the right to appear in court with the dignity and self-respect of a free man. State v. Tennant, supra; State v. Kinchen, 290 So.2d 860 (La.1974); State v. Thomas, 325 So.2d 593 (La.1976). When examining this issue on appellate review, this court has focused on whether defendant demonstrated that his clothing at trial was readily identifiable as prison attire. In State v. Tennant, 262 La. at 947, 265 So.2d at 234, the court found that the uniform of East Baton Rouge Parish prisoners was not identifiable as prison clothing, and reasoned:
"Current dress fashions indicate that many young people show a preference for dungarees, jeans and similar attire. The work clothing worn by these young defendants, ranging between 18 and 26 years of age, described by the trial judge, would not necessarily be considered unusual, or peculiarly prison garb by today's standard. There were no large stripes, numbers, names or other such markings usually associated with prison garb. The fact that this clothing was issued to prisoners in the East Baton Rouge Parish prison does not make it readily recognizable as prison garb by persons not familiar with that prison. We venture to say that all prisons do not issue clothing, and it is not shown that the clothes described are generally considered prison garb. For these reasons, we find that these defendants have failed to bear the burden of proof incumbent on them to establish that the clothing they wore was regarded by the jurors as `prison garb.'"
Similarly, this court found that gray coveralls, State v. Thomas, supra, and denim pants and shirts, State v. Nicolaus, 340 So.2d 296 (La.1976) and State v. Yates, 350 So.2d 1169 (La.1977) were not identifiable as prison clothing and that trying defendant in such attire over his objection did not constitute reversible error. The court's analysis of the issue conforms with the United States Supreme Court in Estelle v. Williams, 425 U.S. 501, 512,96 S.Ct. 1691,48 L.Ed.2d 126 (1976) where the court reasoned that the state cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothing.
However, in Tennant, in Thomas, in Yates and in Nicholaus, the defense only objected to the prison clothing after voir dire or after trial began; in the instant case defense objected before voir dire. When the defense objects before the jury is impaneled and the objected is not simply a dilatory tactic, then the state is not prejudiced by allowing defendant the extra time to change to civilian clothing. The trial court erred in not allowing the defendant this right. Defendant should not be required to wear a prison jumpsuit at his trial, however attractive, if defendant objects and desires to wear his own civilian clothing.
In the instant case, however, the trial court's error does not warrant reversal of the conviction.[4] In contrast to the prejudice defendant suffered by being forced to wear prison clothing at his trial, other evidence in the record had far greater potential for prejudicial effect on the jury: defendant acknowledged incriminating involvement in the bank robbery during his cross-examination of every state witness; defendant was identified by all eyewitnesses (four bank employees), a United States Marshal and an arresting police officer; defendant was identified in seven photographs taken during the bank robbery by *439 the bank surveillance camera; defendant took the stand against advice of his counsel and admitted that he had been previously convicted of robbery; and finally, while on the stand defendant admitted that he was the man in the bank who took the money.[5]

Assignment of Error No. 4
Defendant contends that the trial court erred in admitting into evidence all items of evidence used by the state without a proper foundation and no chain of custody. The evidence consisted of photographs taken of the robbery by the bank surveillance camera (S-1-S-7), hat worn by the defendant (S-8), pants, coat and vest worn by defendant (S-9-S-11), the gun used in the robbery (S-12), plastic bag containing $3200 taken in the robbery (S-13) and shirt worn by defendant (S-14).
Concerning photographs S-1 through S-7, it is a well settled rule that a photograph need not be identified by the person who took it to be admissible in evidence. State v. Robertson, 358 So.2d 931 (La.1978) and the cases cited therein. Generally, photographers are admissible in evidence when they are shown to have been accurately taken, to be a correct representation of the subject in controversy, and when they tend to shed light upon the matter before the court. State v. Robertson, supra; State v. Cass, 356 So.2d 936 (La.1977); State v. Freetime, 334 So.2d 207 (La.1976); State v. Lacoste, 256 La. 697, 237 So.2d 871 (1970). A proper foundation for admission in evidence of a photograph is laid when witnesses, having personal knowledge of the item or incident depicted by the photograph, identify it. State v. Robertson, supra. In the present case the photographs were identified by the bank teller and two other bank employees who witnessed the robbery.
Concerning demonstrative evidence S-8 through S-14, the law requires that the objects be identified to admit them in evidence at trial. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered in evidence at trial. State v. Williams, 362 So.2d 530 (La.1978).
In the present case all the demonstrative evidence was identified by state witnesses: S-8, the hat, by four witnesses; S-9, S-10 and S-11, the three piece suit, by six witnesses; S-12, the gun, by four witnesses; S-13, the money bag, by two witnesses; and S-14, the shirt, by one witness. Also, a police officer in the criminal investigation division identified all the demonstrative evidence and testified that he had received the evidence, marked, tagged and dated it for identification, and placed it in the robbery evidence book.
Assignment of Error No. 4 lacks merit.

Assignments of Error Nos. 5 and 6
Defendant contends that the trial court erred in instructing the jury according to the state's special charge that provided:
"A person who commits a robbery by pointing an unloaded and unworkable gun at the victim can be adjudged guilty of armed robbery. Stated another way, a person can be convicted of an armed robbery even if the gun is unloaded or unworkable because an unloaded or unworkable *440 gun in the hands of a person intent on divesting another of his money is a dangerous weapon."
Specifically, defendant contends that the air pistol taken from him at the time of his arrest was unworkable. The special charge concerns unloaded and unworkable guns and defendant contends that the special requested charge was prejudicial to his case because it was not a correct statement of law under State v. Levi, 259 La. 591, 250 So.2d 751 (La.1971); State v. McClinton, 329 So.2d 676 (La.1976); State v. Elam, 312 So.2d 318 (La.1975).
Defense's position that the special charge is contrary to state law is undercut by the fact that the charge is taken directly from State v. Levi, 259 La. at 598-99, 250 So.2d at 754:
". . . An unloaded revolver in the hands of a person intent on divesting another of his money is a dangerous weapon. We hold that a person who commits a robbery by pointing an unloaded and unworkable pistol at the victim can be adjudged guilty of armed robbery.. . ."
In Levi, the court stated that for the court to hold otherwise would be to build into Louisiana law an "unloaded weapon" defense that would defeat most prosecutions for armed robbery except when the offender is captured at the scene and his weapon seized. The court reasoned that to be classified as a dangerous weapon, a pistol need not be capable of firing.
In all three cases that defense cites in brief, the court found that a person may be convicted of robbery with a dangerous weapon even though the gun used is unloaded and/or unworkable. State v. McClinton, supra; State v. Elam, supra; State v. Levi, supra. But an unloaded and unworkable gun also can be considered a dangerous weapon, as defined by R.S. 14:2(3) which provides: "`Dangerous weapon' includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." In State v. Levi, 259 La. at 595, 250 So.2d at 753, the court reasoned that both a continuous threat and capability exist that an unworkable or unloaded gun will be used as a bludgeon, and explained:
"In making robbery with a dangerous weapon an aggravated offense with severe penalties, LSA-R.S. 14:64 was designed to deter robbery fraught with danger of serious physical harm, not only to the victim, but to any person at the scene. In such a robbery, harm may occur to the victim, to the culprit, or to a third party. It can occur in various ways. The victim may be shot or struck with the weapon by the culprit. The culprit may be shot or struck by the victim or a third party. A third party may be shot or struck by the culprit, the victim, or another third party. The highly charged atmosphere at the scene of a pistol-robbery is conducive to violence, whether the pistol is loaded or unloaded, workable or unworkable. Danger invites rescue. It also invites self-help. See State v. Johnston, 207 La. 161, 20 So.2d 741; Bass v. State, Fla.App., 232 So.2d 25; Baker v. United States, (U.S. 5th Cir.) 412 F.2d 1069."
In the present case defendant was holding a 177 caliber Crossman air pistol or pellet pistol which was designed according to expert witness "to represent a 50 Wesson, a 357 Magnum target pistol." The expert witness testified that the air pistol could possibly kill and could cause great bodily harm if shot at a person's eye. All the witnesses to the bank robbery testified at trial that they believed defendant was armed with an ordinary pistol that could shoot regular bullets. Defendant's contention that the special charge is contrary to state law lacks merit and the trial court did not err in failing to grant defense motion for a new trial on the grounds that the state did not prove use of a dangerous weapon, an essential element of R.S. 14:64.
Assignments of Error Nos. 5 and 6 lack merit.
For the reasons assigned, defendant's conviction and sentence are affirmed.
SANDERS, C. J., concurs in the decree.
NOTES
[1] "BY THE COURT:

The Bill of Information was filed the 25th day of August on September 2nd, was filed September 2nd, or maybe September 6th, but going back it was filed in the early part of September, it was allotted, the arraignment was set for the 8th. On the 8th the defendant informed the court he would hire private counsel, was refixed for arraignment and examination for counsel for the 12th of September. The 12th of September the court appointed John Lawrence for arraignment. The trial was set for October 11th. September 30th motions were filed. The hearing was had on October 2nd. The hearing continued until October 11th. The hearing continued until October 12th. The hearing was held on October 12th, a trial date set forty days later, meaning today (November 22). The court will denied (sic) the motion to permit you to withdraw."
[2] Specifically, the motion to withdraw alleged:

"The defendant and his counsel are in opposition as to the manner and methods of the defense; defendant demands to enter a plea of Not Guilty and Not Guilty by Reason of Insanity which defense counsel does not concurr (sic) and feels that there is no basis for such plea, the evidence being that defense counsel requested an evaluation by the Parish Prison medical facility which indicated no basis of any insanity, psychosis or mental disease affecting defendant and defendant has at all interviews with counsel been able to assist counsel, has clearly and intelligently discussed the offense alleged and defense counsel cannot in good conscience enter an insanity defense which would be a delaying tactic.
[3] The following exchange occurred between the trial judge and the defendant concerning wearing his civilian clothing:

"Let me ask you Mr. Leggett, do you feel as though you are at a disadvantage because of this uniform?" (Yellow jumpsuit).
BY THE DEFENDANT:
Would you say that again?
BY THE COURT:
Do you feel that as though you are at a disadvantage because of this dress?
BY THE DEFENDANT:
I feel I am disadvantage that nobody is here to see.
BY THE COURT:
We would have to disregard that answer, but particularly do you feel as though you are at a disadvantage with this clothing on? Do you think this clothing has anything to do with maybe presenting an improper picture of you? Do you feel as though this dress itself, the uni. . . this jumpsuit is. . .
BY THE DEFENDANT:
I rather have on my own clothes.
BY THE COURT:
But do you feel as though this clothing indicates anything to anyone?
(LONG PAUSE)
BY THE COURT:
Do you find this jumpsuit improper in any way?
BY THE DEFENDANT:
I rather have on my own clothes.
BY THE COURT:
The court will . . . have a seat. The court will rule on this matter and the matter will go to trial."
[4] The record in the present case indicates that the defendant was never compared with other prisoners dressed in identical jumpsuits; no photographs of defendant at a line-up with other prisoners were introduced. Only two witnesses identified defendant as the "man in the yellow jumpsuit." In Tennant, four co-defendants were seated together in court wearing identical blue and white striped denim suits that might cause jurors to wonder about the identical clothing and the informality of dress.
[5] "BY THE DEFENDANT:

I would just like to say as I stated in my opening remarks, I was in that bank on Tulane Street . . . may I see the pictures?
BY THE COURT:
Yes you may.
BY THE DEFENDANT:
As the pictures shows me in the bank was my finger on the gun handle? As you see I am not hurting no lady. I want to tell you ahead of time, I have been in trouble with the law before in Cleveland, Ohio. I never was convicted of armed robbery, I was convicted of just robbery, not armed robbery, as far as this charge goes, I am innocent of armed robbery. I didn't arm robbed anyone, especially that woman. I would never take any citizen's money. I was in the bank, I was in the process of getting the money out of the drawer, the bank guy came, I got behind the lady, I just wanted to keep from getting shot, because I know the bank guy would shoot me from behind . . ."