PITMAN, J.
|,A jury convicted Defendant LaQuinn Murray as charged of second degree murder, and he was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The jury also convicted him as charged of attempted second degree murder, and he was sentenced to 38 years’ imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant now appeals his convictions. For the following reasons, we affirm.
FACTS
On July 19, 2012, the state filed an indictment -in which a grand jury charged Defendant with second degree murder in violation of La. R.S. 14:30.1 and attempted second degree murder in violation of La. R.S. 14:30.1 and La. R.S. 14:27. The indictment alleged that, on or about May 16, 2012, Defendant committed the second degree murder of Jonathan Simo and the attempted second degree murder of Devin Marshall. A jury trial began on January 13, 2014.
Multiple witnesses of the shooting and the events leading up to the shooting — i.e., Defendant’s girlfriend, Jamika Jones; Ashley Barr; Cameron McCrady; Larry Daughtry; and victim, Devin Marshall— testified at trial and offered consistent testimony. McCrady testified that he grew up with Defendant, Simo, Marshall and Daughtry and that they were all friends. Marshall also testified that they were friends, but noted that there was tension leading up to the events of May 16, 2012.
Jones., McCrady and Marshall testified that, on the night before the May 16, 2012 shootings, Defendant drove to the LaTier-ra Apartments and 12shot a gun into the air while standing in the parking lot. Marshall explained that he told Defendant to *921 quit shooting and said he would call the police.
Jones noted that, the next day, Defendant became upset when his sister, Gabrielle Murray, told him that Marshall called the police and that Defendant then “went on a hunt to find” Marshall. Jones, Daughtry and Marshall testified that Defendant went to Simo’s house and confronted Marshall. Marshall testified that Defendant asked him if he called the police on Defendant, and Marshall responded that he did not call the police, but that his sister-in-law did. Marshall stated that Defendant “turned his shoulder and come up with the gun.” Marshall explained that this was the same gun, i.e., a black and gray .40 caliber Smith & Wesson, that Defendant shot the night before at the LaTierra Apartments and stated that Defendant carried this gun “all the time.” Jones stated that Defendant “went to shoot [Marshall], but [the gun] wouldn’t shoot.”[1] She testified that Simo then ran outside and told Defendant “don’t do that.” Marshall stated that he took off running and Simo “kind of grab [sic] [Defendant], got the gun, took the bullet out of the chamber, took the clip out, and told him, you can’t do this in front of my house.” Jones and Daughtry also testified that they saw Simo and Defendant wrestle with the gun. Jones, Daughtry and Marshall all testified that Defendant then got back in his SUV and drove away. Jones noted that neither Simo nor Marshall had a gun and that Defendant told Marshall that “it wasn’t over.”
|aJones testified that she and Defendant then returned to his house, he changed into all black clothing, i.e., black pants, black shoes, black shirt and a black skull cap, and they went to Walmart.[2] She noted that Defendant began getting phone calls from his sister, Gabrielle, who was with Simo. Jones testified that Defendant heard Simo say something like “[t]here ain’t no gangsters in your family” to Gabrielle, which made Defendant mad. Jones also stated that Gabrielle sent a text message to Defendant telling him “to get [Marshall and Simo] before they got him because they were plotting against him.”[3] Barr testified that she was at Jaldell Riley’s house, which is located across the street from the LaTierra Apartments, with Gabrielle, Simo, Marshall, Riley and Daughtry. She explained that Gabrielle and Simo were in a relationship and that they were arguing. Barr testified that she overheard a comment that “flared everything up,” i.e., the “no gangsters in your family” comment that Simo said to Gabrielle. Barr explained that this comment was meant as an insult and that Gabrielle *922 called someone on the phone after the comment was made. Marshall testified that he heard Simo on the phone with Defendant, and Simo said, ‘You know what I’m saying with the pistol, I get it. Don’t come down here with all that shooting, and |4stuff. Come down and fight, if you want to fight.” He stated that Gabrielle then approached Simo and stated, “Ain’t no gangsters out here, I guess,” and that she and Simo “had a little words.”
Jones stated that, after she and Defendant left Wal-Mart, they went to the LaTi-erra Apartments. She added that there were a lot of people standing outside when they arrived — some at the apartments and some at a house across the street. Jones, Barr, McCrady, Daughtry and Marshall all testified about the shootings that occurred when Defendant exited his vehicle at the LaTierra Apartments. Marshall stated that he was at the house across the street and Defendant walked over from the apartments and began firing a gun at him. Marshall testified that he was shot five times — twice on each side in the shoulder and arm area and once in his back — but that Defendant shot the gun more than five times. Marshall stated that he fell to the ground and then saw Defendant shoot Simo seven times. Jones testified that she observed Marshall start running and then saw Defendant run after him. She testified that she heard five or six gunshots and then saw Defendant come back to where Simo was standing in the parking lot. She stated that Defendant then shot Simo, Simo fell and Defendant continued to shoot him. McCrady testified that he saw Defendant, who was wearing all black, shoot Marshall and that he (McCrady) then ran away, so he did not witness Simo being shot. Daughtry stated that his back was to Defendant so he did not see whom Defendant was shooting, but that, when he turned around, he saw that Marshall had been shot. Daughtry testified that Defendant then walked across the street and shot Simo six or seven times. Barr testified that she | ¿heard gunshots coming from Riley’s yard and that she saw Defendant come from that direction. She stated that Defendant then shot Simo in the apartment parking lot, Simo fell to the ground, Defendant began walking away and then turned around and shot Simo two more times.
Jones testified that Defendant then got back in the SUV, and they drove to his house. She stated that Gabrielle and Barr also arrived at the house and that everyone was in shock. She further testified that she observed Murray give Defendant’s gun to Defendant’s father, who then hid the gun. Barr testified that she went to Defendant’s house after the shooting and that he was there stating things like “hide the gun ... who is going to snitch.”
Marshall testified that, after Defendant left the scene, Riley called the police. He was taken to the hospital and, while there, spoke with several detectives and identified Defendant in a photo lineup as the shooter.
Multiple law enforcement officers from the Shreveport Police Department (“SPD”) testified about their involvement in this case. Corporal Sherrie Stump, a crime scene investigator, testified that she collected ten .40 caliber expended shell casings and other evidence from the scene. She stated that she searched Defendant’s house and his white SUV, which was parked in the carport. She stated that a black gun holster was located inside the SUV. She noted that packaging for a Smith & Wesson .40 caliber magazine; an empty box of .40 caliber ammunition; and a black skull cap, a black shirt and black *923 pants were collected from the residence.[4]
| (¡Sergeant Michael Hinderberger, a homicide investigator, testified that he prepared a photographic lineup. He stated that he met Marshall at LSU Hospital and noted that he was alert and conscious. He stated that Marshall named Defendant as the suspect, explaining that he had known Defendant since childhood. Sgt. Hinder-berger testified that Marshall identified Defendant in a photographic lineup as the shooter.[5]
Cornelius[6] Jenkins testified that he is a salesperson at National Jewelry, a pawn shop that sells firearms, and explained that special paperwork is required for a person to purchase a firearm. He testified that he provided a copy of a firearm transaction receipt for Defendant to the SPD, which stated that, on December 23, 2011, Defendant purchased a Smith & Wesson .40 caliber pistol.
James Traylor, M.D., an expert in forensic pathology, testified that he performed an autopsy on Simo. Dr. Traylor determined the cause of death to be multiple gunshot wounds. He noted that there were five penetrating gunshot wounds, meaning that the bullet went in the body and did not exit, so he was able to retrieve each of the bullets. Dr. Traylor stated that one gunshot was to the top of the left ear, one to the top of the left side of the head, one that went through the left jaw and reentered in the right shoulder region, one on the upper left arm, and one on the left index finger. Dr. Traylor noted a possible sixth gunshot to the upper left thigh and suggested that the bullet that hit the index finger may have reentered the 17thigh. He stated that he observed what is called tattooing on Simo’s skin, explaining that it occurs when the muzzle end of the weapon is close to the surface of the skin. Dr. Traylor also noted that the gunshots to the victim’s head caused extensive damage to the brain and the bone around it and that either wound to the head “in and of themselves or in combination” was “immediately incapacitating” and “lethal.” Dr. Traylor hypothesized that the two gunshots to the head were likely fired first, followed by the other three gunshots.
Carla White, an expert in firearm identification and employed by the North Louisiana Criminalistics Laboratory, testified that she examined evidence in this case submitted by the SPD. Ms. White determined that of the ten fired cartridge cases collected from the crime scene by Cpl. Stump, nine were fired by the same weapon, specifically a .40 caliber weapon, and one was fired by a different weapon. She stated that she also examined bullets recovered from Simo’s body and from Marshall and determined that these bullets were fired by the same .40 caliber weapon as the nine cartridges collected at the crime scene. She noted that she examined additional evidence recovered by Det. Holmes at a different parking lot at the LaTierra Apartments, i.e., 12 fired .40 caliber cartridge cases, and determined that these were fired by the same weapon.
After the state rested, Defendant elected to testify, against the advice of his attorney. Defendant stated that he did not shoot Marshall or Simo and that he did not shoot a gun into the air at LaTierra Apartments on May 15, 2012. He admit *924 ted that he confronted Marshall at Simo’s house on May 15, |82012, but stated that he did not have a gun. He also admitted that he purchased a .40 caliber Smith & Wesson in December 2011, but did not know the current location of the gun.
On January 17, 2014, a unanimous jury found Defendant guilty as charged of both charges.
On January 28, 2014, Defendant filed a motion for modification of verdict requesting that a verdict of convictions for manslaughter and attempted manslaughter be entered. On January 28, 2014, a hearing was held on Defendant’s motion, and the trial court denied this motion, finding that it was not supported by the evidence or the law.
On February 25, 2014, the trial court sentenced Defendant to the mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence for the conviction of second degree murder. For the conviction of attempted second degree murder, the trial court analyzed the La. C. Cr. P. art. 894.1 factors and sentenced Defendant to 38 years at hard labor without the benefit of parole, probation or suspension of sentence. The trial court ordered these sentences to run concurrently with each other, and credit was given for time served.
On February 27, 2014, Defendant filed a motion to reconsider sentence, which the trial court denied on February 28, 2014.
Defendant appeals his convictions and sentences.
| nDISCUSSION

Sufficiency of the Evidence

In his first assignment of error, Defendant argues that the evidence presented at trial was insufficient to convict him of second degree murder or attempted second degree murder. Defendant contends that he was acting under the provocation of sudden passion or heat of blood and, thus, he is, at most, guilty of manslaughter and attempted manslaughter. The state argues that the evidence presented at trial is sufficient to convict Defendant of second degree murder and attempted second degree murder.
The standard of appellate review for a sufficiency of the evidence claim is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hearold, 603 So.2d 731 (La.1992). See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder’s discretion unless it is necessary to guarantee the fundamental due process of 110Iaw. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
*925 Thus, in order for Defendant’s convictions to be upheld, the record must establish that the state proved beyond a reasonable doubt all of the essential elements of second degree murder and attempted second degree murder. La. R.S. 14:30.1(A) defines second degree murder, in pertinent part, as “the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm [.]” La. R.S. 14:27 defines attempt, in pertinent part, as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B.(l) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon
with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
Although the statute for the completed crime of second degree murder allows for a conviction based on specific intent to kill or to inflict great bodily harm, attempted second degree murder requires the specific intent to | nkill. State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434, citing State v. Huizar, 414 So.2d 741 (La.1982).
Specific intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Such state of mind can be formed in an instant. State v. Allen, 41,548 (La.App.2d Cir.11/15/06), 942 So.2d 1244, writ denied, 07-0530 (La.12/7/07), 969 So.2d 619, citing State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382. Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the defendant’s actions. Id., citing State v. Graham, 420 So.2d 1126 (La.1982), and State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 634 So.2d 371 (La.1994). Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim’s injuries. State v. Thornton, 47,598 (La.App.2d Cir.3/13/13), 111 So.3d 1130, citing State v. Patterson, 10-415 (La.App. 5th Cir.1/11/11), 63 So.3d 140, writ denied, 11-0338 (La.6/17/11), 63 So.3d 1037, and State v. Durand, 07-4 (La.App. 5th Cir.6/26/07), 963 So.2d 1028, writ denied, 07-1545 (La.1/25/08), 973 So.2d 753.
Defendant argues that he is, at most, guilty of manslaughter and attempted manslaughter. La. R.S. 14:31(A)(1) defines manslaughter, in pertinent part, as:
A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an 112average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed [.]
“Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigating factors in the nature of a defense that exhibit a degree of culpability less than that present when the homicide is committed without them. State v. Lombard, 486 So.2d 106 *926 (La.1986), citing State v. Tompkins, 403 So.2d 644 (La.1981), State v. Temple, 394 So.2d 259 (La.1981), and State v. Peterson, 290 So.2d 307 (La.1974). The defendant bears the burden to prove, by a preponderance of the evidence, that he acted in sudden passion or heat of blood in order for manslaughter to be appropriate. State v. Thornton, supra, citing State v. Logan, 45,136 (La.App.2d Cir.4/14/10), 34 So.3d 528, writ denied, 10-1099 (La.11/5/10), 50 So.3d 812, State v. Lang, 42,125 (La.App.2d Cir.5/30/07), 960 So.2d 318, writ denied, 07-1469 (La.1/11/08), 972 So.2d 1161, and State v. Hendricks, 38,945 (La.App.2d Cir.9/22/04), 882 So.2d 1212, writ denied, 04-2833 (La.3/18/05), 896 So.2d 1000. Provocation and time for cooling are questions for the jury to be determined under the standard of the average person, one with ordinary self control. State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that these mitigating factors had not been established by a preponderance of the [ isevidence. State v. Robinson, 32,794 (La.App.2d Cir.3/1/00), 754 So.2d 311, writ denied, 787 So.2d 1008 (La.2001), citing State v. Lombard, supra, and State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797.
In the case sub judice, the state presented overwhelming evidence that Defendant had specific intent to kill or inflict great bodily harm on Simo and had specific intent to kill Marshall. Marshall, Jones, Barr, McCrady and Daughtry all identified Defendant as the shooter. The trial witnesses demonstrated Defendant’s specific intent to kill when they consistently stated that Defendant pointed his gun at Marshall and then pursued him as he ran away, firing multiple rounds into his back, shoulders and arms. Marshall’s trial testimony stated that he fell to the ground after being shot and that Defendant kicked him and then went to shoot Simo. The witnesses’ trial testimonies suggest that, without hesitation, Defendant fired two shots into Simo’s head, immediately incapacitating him, and that Defendant then fired additional bullets into Simo’s body. Defendant’s actions of shooting each victim multiple times — both victims had at least five gunshot wounds — further demonstrate his specific intent to kill each victim and/or to inflict great bodily harm upon Simo. The state’s evidence also suggests that Defendant’s decision to change into all black clothing demonstrates intent to commit these crimes. The evidence was sufficient to prove, beyond a reasonable doubt, that Defendant had specific intent to kill Marshall and had specific intent to kill or inflict great bodily harm on Simo. Furthermore, the jury unanimously found Defendant guilty of second degree 114murder and attempted second degree murder despite being given the responsive verdicts of manslaughter and attempted manslaughter.
Defendant has not met his burden of proving, by a preponderance of the evidence, that he acted in sudden passion or heat of blood in order for the verdicts of manslaughter or attempted manslaughter to be appropriate. Defendant fails to demonstrate that he acted under sufficient provocation to justify the murder of Simo and the attempted murder of Marshall. The victims did not provoke Defendant when he arrived at the LaTierra Apartments-there was no confrontation between Defendant and the victims. Defendant exited his vehicle and immediately pursued each victim before shooting them multiple times. Although the witnesses’ trial testimonies suggest that Defendant was angry *927 at Simo for stating that there were no gangsters in his family and was angry at Marshall for allegedly calling the police after Defendant shot a gun into the air, Defendant fails to establish that the average person with ordinary self control would have been provoked to the level that shooting his adversary multiple times was reasonable. Furthermore, sufficient time for cooling elapsed between these provoking events and the shootings. The confrontation between Defendant and Simo and Marshall concerning Marshall allegedly calling the police on Defendant occurred the day before the shooting. Simo’s comments about there being no gangsters in Defendant’s family were not made directly to Defendant, but were communicated through his sister by text and/or phone call. Defendant sought out both victims after a sufficient “cooling-off’ period had elapsed.
| ^Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found that the state presented sufficient evidence at trial to establish the essential elements of second degree murder and attempted second degree murder. Therefore, this assignment of error lacks merit.

Pro Se Motion to Remove Counsel

In his second assignment of error, Defendant argues that the trial court erred in not conducting a hearing on the pro se motion to remove counsel that he filed on the first day of trial. Defendant argues that the trial court must consider a defendant’s pro se filings made before the verdict when doing so will not lead to confusion at trial. Defendant contends that the trial court had a duty to determine, prior to trial, whether the defendant had a legitimate complaint against his attorney.
The state contends that the record does not reflect that counsel was ineffective in his representation and points out that counsel filed motions for discovery, a supplemental bill of particulars, a motion to prohibit use of other crimes evidence and post-trial motions. Noting Defendant’s outburst in front of the jury concerning his representation, the state contends that “the right to counsel and to counsel of one’s choice cannot be manipulated to obstruct the orderly procedure of the courts or used to interfere with the fair administration of justice.” State v. Franklin, 43,173 (La.App.2d Cir.9/17/08), 996 So.2d 387, writ denied, 08-2371 (La.5/22/09), 9 So.3d 138.
In State v. Lewis, 46,344 (La.App.2d Cir.5/18/11), 69 So.3d 604, writ denied, 11-2282 (La.6/1/12), 90 So.3d 426, this court discussed motions to remove counsel on the first day of trial and stated:
Both the federal and state constitutions provide that an accused has the right to counsel of his own choosing to defend him in a criminal charge. However, this right does not permit the arbitrary action which obstructs orderly procedures in the courts. State v. Leggett, 363 So.2d 434 (La.1978); State v. Reeves, 2006-2419 (La.5/5/09), 11 So.3d 1031; State v. Wilson, 45,060 (La.App.2d Cir.3/10/10), 32 So.3d 1152. Rather, the right to choose one’s attorney is a right to be exercised at a reasonable time, in a reasonable manner, and at an appropriate stage within the procedural framework of the criminal justice system. State v. Leggett, supra. There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, -with the attendant necessity of a continuance and the resulting disruption to the orderly trial of cases. On the day of trial, the question of withdrawal of counsel rests largely within the discretion of the trial court. The Louisiana Supreme Court has consistently upheld *928 the trial court’s denial of motions for continuances or withdrawal of counsel made on the day of trial when defendant is dissatisfied with his present attorney, but had ample time to retain private counsel. Leggett, supra.
In this case, Defendant waited until the first day of trial to file a motion to obtain new counsel. His motion did not demonstrate that he had insufficient time to file this motion prior to trial. In fact, Defendant had been represented by his counsel for more than a year prior to trial and never expressed dissatisfaction with his attorney during this period of representation. Defendant had more than adequate time to retain a different attorney. We note that Defendant’s trial counsel is a well-respected attorney with considerable experience in criminal defense. The record reflects that Defendant’s counsel was well prepared for trial. Although Defendant may have disagreed with his counsel’s trial strategies, Defendant’s motion fails 117to provide support of his conclusory statement that counsel was not acting in his best interest. Furthermore, Defendant failed to provide sufficient grounds to demonstrate that the trial court should obstruct the orderly procedures of the court to conduct a hearing on his motion. The trial court did not abuse its discretion when denying Defendant’s motion for new counsel without a hearing on the first day of trial.
Therefore, this assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the convictions and sentences of Defendant, LaQuinn Murray, are affirmed.
AFFIRMED.

. Jones noted that she viewed these events from the SUV and that she thought Defendant was trying to shoot the gun because he "took it out and cocked it, and aimed it.”

. Richard Upshaw, who works in loss prevention at the Walmart located on Pines Road in Shreveport, offered testimony that corroborated this part of Jones's testimony. He stated that the SPD asked him to review surveillance video from approximately 2:30 a.m. to 2:40 a.m. on May 16, 2012. He testified that the video of the cash register at 2:34 a.m. showed a male and female with the male dressed in all black and with something on his head. He stated that the same couple is seen leaving the store at approximately 2:41 a.m.

. Detective Shaunda Holmes testified as to text messages sent between Defendant and his sister, Gabrielle. One text sent by her to Defendant at 12:21 a.m. on May 16, 2012, stated "Them n* * * over there plotting up on you.” A text sent from Defendant to Gabrielle at 12:24 a.m. stated, "Okay. I need to get [Simo] over here by hisself [sic].” Det. Holmes also confirmed that Gabrielle and Defendant spoke on the phone on the night and early morning leading up to the shooting on May 16, 2012.

.Corporal John Madjerick, a crime scene investigator, offered consistent testimony and stated that he assisted Cpl. Stump at the scene and also searched Defendant's residence.

. Officer Natasha Harmon offered consistent testimony at trial regarding Marshall's identification of Defendant as the shooter.

. Jenkins’s first name is also spelled "Cornelious” in the record.