Judgment rendered February 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,210-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                     Appellee

versus

WILLIE DEWAYNE LYNN                              Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 338,131

Honorable Donald E. Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT                Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                          Counsel for Appellee
District Attorney

JASON W. WALTMAN
REBECCA A. EDWARDS
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and MARCOTTE, JJ.

**PITMAN, C. J.**

Defendant Willie Dewayne Lynn appeals his conviction and sentence for attempted second degree murder. For the following reasons, we affirm.

**FACTS**

Defendant was charged by bill of information with attempted second degree murder, a violation of La. R.S. 14:27 and 14:30.1, for the attack on his friend, Dave Delaney, who was beaten with a metal pipe, suffering very serious and debilitating injuries. Defendant was originally tried and found guilty by a non-unanimous jury and sentenced to 35 years at hard labor without benefit of probation, parole or suspension of sentence. In *State v. Lynn*, 53,189 (La. App. 2 Cir. 1/15/20), 288 So. 3d 881, this court affirmed his conviction and sentence. In *State v. Lynn,* 20-00283 (La. 6/3/20), 296 So. 3d 1035, the supreme court granted writs and remanded for further proceedings and to conduct a new error patent review in light of *Ramos v. Louisiana*, 590 U.S. ——, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020). In *State v. Lynn*, 53,189 (La. App. 2 Cir. 7/15/20), 299 So. 3d 217, this court reversed his conviction and sentence, and a new trial was held in Caddo Parish on April 19, 2022.

At the trial, Alexis Arkansas, Delaney's cousin, testified that she was dating Defendant and that Defendant and Delaney were best friends. On her birthday, January 24, 2016, she held a party at her second-floor apartment in Shreveport to which Delaney, his girlfriend, Rose Hunter, and Jameshia Allen were invited. She stated that the party had started and all of the invitees were seated at a table to play cards when Defendant phoned her, got angry with her, called her names and asked who was there at her apartment. She hung up on him; but after ten minutes, he arrived at her apartment, let

himself in with his key and began pushing her and asking her who she was "playing with" on the phone. He knocked her off her chair, and they began physically fighting. She testified that they continued fighting out onto the balcony of the apartment and that Defendant must have hit her on the head with his fist because she had a knot. None of the guests at the party intervened.

Arkansas also testified that members of the party eventually followed them outside; but by that time, Delaney had gone downstairs to the parking lot. She called to him for help, and he said, "Y'all need to cut that shit out. Don't start that." She stated that Defendant responded, "This is my girlfriend. You stay out of it." Delaney continued to try to calm the situation saying, "We don't have time for that today." Defendant went down the stairs and confronted him in the parking lot.

Arkansas further testified that the men were pushing each other in the parking lot when Delaney hit Defendant in the face with a lock he held between his fingers, and she noticed blood on Defendant's mouth. She heard Defendant say, "I've got something for you." He went upstairs, retrieved an unknown object, then went to his truck and removed a jack handle from the vehicle. She stated that Delaney was standing by his own car, close to Defendant's truck, when Defendant began swinging the handle at Delaney. He missed a few times but then struck Delaney in the head. Delaney fell to the ground. She testified that she and the other women were still on the balcony, but she thought she saw Defendant hitting Delaney on his legs about six times. She stated that Delaney was lying on his back and did not try to rise.

2

Arkansas further testified that she left the balcony to go to the parking lot, and Defendant started chasing her with the jack handle saying, "Bitch, I'll kill you too." She ran into her apartment and locked the door, but Defendant knocked it down, went inside and then left. Hunter and Allen were outside in the parking lot with Delaney, who was still lying on the ground.

On cross-examination, Arkansas testified that while Defendant was striking her, she was hitting back. She stated that Delaney had gone down to the parking lot to his car to fix a drink, but he had not been drinking before that time. Defendant went down the stairs and confronted Delaney in the stairwell of the apartment while she and the other women stayed on the balcony. She stated she did not see who initiated the pushing, but believed Delaney was holding a lock in the palm of his hand. It was midnight and dark, and the apartment complex only had one pole light, but she was able to see Defendant remove a "jack pole" from the back of his truck and described it as "eight or nine inches" long. She stated that once he retrieved it, he began swinging at Delaney, who tried to hit back, but slipped and fell to the ground. Defendant continued swinging the pole and hitting Delaney while he was on the ground.

Hunter's testimony was the same as that of Arkansas up to the point that Defendant arrived at the apartment. She stated that when Arkansas ran outside to ask Delaney for help, she heard Defendant say, "Well, he can get the same thing that you get." She stated that when Delaney reached in his pocket, she heard Defendant say, "You got a lock. You got a lock." She stated that Defendant went to his truck to get something with which to defend himself. Delaney then hit Defendant with the lock, and Defendant

3

retaliated by hitting him with the jack handle. She testified that Defendant continued to hit Delaney after he fell to the ground and was not moving, including multiple times in the head. She stated that she saw Defendant go back into the apartment and that she could hear him cursing at Arkansas. Defendant came back down the stairs and started hitting Delaney with the jack handle again, even though Delaney was still lying on the ground and had not moved, and then Defendant "disappeared." She stated that Delaney had been known to fight with a lock in his hand one other time, that he swung first and then Defendant started using "a black pipe thing or whatever" to hit him on the head multiple times.

Allen testified that she was acquainted with Defendant through Delaney. She stated that prior to this incident, Delaney was a self-sufficient person with a job and lived in a condo. Her testimony was similar to that of Arkansas and Hunter regarding the phone call, the fight in the house and the move from the apartment to downstairs, but stated that Delaney said more than for them to calm down. She stated that he suggested they keep the fight inside, that people were outside and staring and that the police were going to be called. This caused Defendant to go into a rage and say, "I got something for you." She testified that Defendant went to his truck and retrieved an unknown object. Delaney was standing still, and Defendant began swinging the object from the truck at him. He originally missed, but then swung and struck Delaney in the head multiple times. She stated that Delaney did nothing and was lying on the ground bleeding, when Defendant eventually stopped hitting him and went back upstairs. She checked on Delaney to see if he was still breathing. Another man was standing by her while she was tending to Delaney when Defendant came back downstairs and smashed

Delaney's phone and then left. Delaney was bleeding profusely, trying to talk and blood was spewing out. She stated she never saw Delaney get a lock or swing or punch at Defendant. He was never aggressive in any way and appeared to be in shock at what was happening because he and Defendant were such good friends.

Carlos Glass-Bradley, special investigator for the Shreveport Police Department, testified that he was on patrol duty on January 24, 2016, and responded to the scene, where he saw Delaney lying in a pool of blood. He stated that the victim's head was "smashed in pretty good, blood and thick looked like brain matter coming from his ears and nose." He was still breathing, but there were blood bubbles as if he were drowning in a pool. Ofc. Niakia Channell was also on scene and together they rolled Delaney over on his side because he was "starting to drown in his own blood." Ofc. Channell held his head up out of the blood while they awaited the fire department.

Ofc. Channel testified that she was a patrol officer for the Shreveport Police Department and responded to the scene on January 24, 2016. When she encountered Delaney lying face down in a pool of blood, she and another officer lifted him to help him breathe and to render first aid. She stated that when they lifted him, his head stayed on the ground because "it wasn't attached." She testified that there was nothing they could do for him except keep his face from lying in the blood so he could breathe.

Ofc. Darrien Jackson testified that he was employed with the Shreveport Police Department in January 2016 as a patrol officer and was working at the apartment complex as a security officer to earn extra money. He was told there was trouble in the parking lot and when he arrived, he

5

found Delaney lying in a pool of blood and brain matter. He called for backup; and once it arrived, they searched for the suspect. He apprehended Defendant coming out of a dumpster and turned him over to a K-9 unit.

Joshua Mayfield testified that he formerly worked as a detective for the Shreveport Police Department and investigated the incident in January 2016. He took multiple pictures of the scene and identified the photos which were admitted. He also stated that he interviewed Arkansas, Hunter and Allen at his office and that they all told the same story that Defendant hit Delaney multiple times with a jack handle.

Dr. Bharat Guthikonda, neurosurgeon, stated that he was involved in Delaney's treatment when he was brought to the hospital in January 2016. Delaney was considered a tier one level of acuity, the most significant level of need for treatment, with a depressed skull fracture and some contusion or bruising of the brain tissue on that side. He performed emergency surgery, a craniectomy, to repair the damage to the skull, brain lining and the brain, and later a bolt procedure to allow a catheter to be placed to monitor pressure inside the brain. Delaney stayed in the hospital for three weeks, receiving physical therapy, and regained some neurologic function. He underwent another surgery after developing an infection. "Everything" in terms of the bone and plates that had been put in the skull had to be removed. Delaney was in the hospital for a total of five or six weeks after the trauma.

Dr. Leigh Henderson testified that she practices physical medicine rehabilitation, which treats physical/functional impairment of patients who have had strokes, head injury, spinal cord or severe traumatic injuries. She treated Delaney at the acute inpatient rehabilitation hospital for his

6

significant injuries to the right side of his brain and skull. He had no bone left on that side and he lost brain matter approximately the size of a softball. She stated that he will never be able to care for himself, that 75% of his self-care daily functions will need to be performed by caregivers and that he will need 24-hour care. He cannot feed himself or move from the bed to a wheelchair by himself. She stated that there is no possibility that he will ever recover or regain what he has lost.

Tina Delaney, Delaney's sister, testified regarding his current condition and reiterated the same deficiencies noted by Dr. Henderson.

Delaney testified he is now 46 years old and lives with his mother. He stated that prior to the incident, he was a tire technician, drove himself and had his own home but lost everything. He does not remember hitting Defendant with a lock and denied that the lock found at the scene came from him.

The state rested and the defense did not present any evidence.

The jury returned a unanimous verdict of guilty as charged of attempted second degree murder.

The sentencing hearing was held in June 2022, and the trial court considered all of the factors enumerated in La. C. Cr. P. art. 894.1(B), both mitigating and aggravating, and found no mitigating factors. It found that Defendant's acts manifested deliberate cruelty to the victim and that he used threats or actual violence in the commission of the offense which resulted in significant permanent injury to the victim. It sentenced Defendant to serve 35 years at hard labor without benefit of probation, parole or suspension of sentence but gave credit for time served.

7

Defendant filed a timely motion to reconsider sentence, which was denied. He now appeals his conviction and sentence.

## DISCUSSION

*Sufficiency of the Evidence*

Defendant claims the evidence is insufficient to prove his guilt because the testimony of Arkansas, Hunter and Allen is inconsistent and, further, that the evidence indicates that Delaney, who hit him in the face with a lock, was the original aggressor. He argues he was entitled to defend himself against the aggressor.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Murray*, 49,418 (La. App. 2 Cir. 1/14/15), 161 So. 3d 918. *See also* La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. *Id*. The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A

8

reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Murray*, *supra*.

Second degree murder is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1).

An attempt to commit an offense occurs when any person, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object. La. R.S. 14:27(A). Specific criminal intent is the state of mind that exists when the circumstances indicate that the offender actively desires the prescribed criminal consequences to follow his act. La. R.S. 14:10(1).

In nonhomicide cases, La. R.S. 14:19(A)(1)(a) provides that the use of force or violence upon another person is justifiable "[w]hen committed for the purpose of preventing a forcible offense against the person . . . provided that the force or violence used must be reasonable and apparently necessary to prevent such offense." In a nonhomicide case, the defendant bears the burden of proving by a preponderance of the evidence that he acted in self-defense. *State v. Willis*, 55,165 (La. App. 2 Cir. 6/28/23), 367 So. 3d 948.

In a nonhomicide situation, a claim of self-defense is subject to a two-part inquiry. *State v. Barron*, 51,491 (La. App. 2 Cir. 8/9/17), 243 So. 3d 1178, *writ denied*, 17-1529 (La. 6/1/18), 243 So. 3d 1063. First, there is an objective inquiry into whether the force used was reasonable under the circumstances. *Id*. Second, there is a subjective inquiry into whether the force used was apparently necessary. *Id*. A person who is the aggressor cannot claim the right of self-defense unless he withdraws from the conflict in good faith. La. R.S. 14:21.

9

After viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of attempted second degree murder were met beyond a reasonable doubt. There was no discrepancy found in the testimony of Arkansas, Hunter and Allen, who attended the party and who all agreed and testified that they saw Defendant beating Delaney with a jack handle. They all testified that Defendant was the aggressor from the moment he arrived at the apartment, first against his girlfriend, and then against his friend who told him to quiet down. He was described as being "in a rage" and that he armed himself with a weapon and beat his friend in the head, even after his friend was lying unconscious in the parking lot.

Delaney's holding of a lock in his hand, which was his only weapon, is insignificant in light of Defendant's ongoing rage and procurement of the jack handle. None of the evidence presented even suggests the need for self-defense, and Defendant did not present any evidence to meet the burden to prove the necessary elements for the defense to be applicable. He failed to prove that he was not the aggressor or that the force he used was reasonable under the circumstances. Instead, the testimony of the witnesses and the resulting permanent damage to his victim, who is partially paralyzed, blind in one eye, requires 24-hour care, and cannot feed himself or move from the bed to a wheelchair, confirms that the evidence was sufficient to find him guilty of the crime of attempted second degree murder.

For these reasons, this assignment of error is without merit.

*Excessive Sentence*

Defendant argues that his sentence of 35 years without benefit of probation, parole or suspension of sentence is constitutionally excessive.

An excessive sentence claim is reviewed by examining whether the trial court adequately considered the guidelines established in La. C. Cr. P. art. 894.1 and whether the sentence is constitutionally excessive. *State v. Eschenbach*, 53,235 (La. App. 2 Cir. 1/15/20), 289 So. 3d 234. A review of the sentencing guidelines does not require a listing of every aggravating or mitigating circumstance. *Id.* When a defendant's motion to reconsider sentence raises only a claim that the sentence imposed was constitutionally excessive, review of the sentence on appeal is restricted to that claim. La. C. Cr. P. art. 881.1; *State v. Eschenbach*, *supra*.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-0467 (La. 1/15/02), 805 So. 2d 166.

The court must state for the record any aggravating or mitigating factors and the factual basis for the sentence imposed. La. C. Cr. P. art. 894.1(C). The court must consider the defendant's personal history, the defendant's criminal record, the seriousness of the offense and the likelihood of rehabilitation. *State v. Boehm*, *supra*. There is no requirement that specific matters be given any particular weight at sentencing. *Id.*

11

The trial court has wide discretion in imposing sentence within the statutory limits, so absent a showing of an abuse of that discretion, a sentence will not be set aside as excessive. *State v. Mandigo*, 48,801 (La. App. 2 Cir. 2/26/14), 136 So. 3d 292, *writ denied*, 14-0630 (La. 10/24/14), 151 So. 3d 600. The reviewing court does not determine whether another sentence would have been more appropriate but whether the trial court abused its discretion. *State v. Boehm*, *supra*.

Second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B). If the attempted offense is punishable by life imprisonment, the defendant shall be imprisoned at hard labor for not less than 10 nor more than 50 years without benefit of parole, probation or suspension of sentence. La. R.S. 14:27(D)(1)(a).

At the sentencing hearing, the trial court recited the facts of the case and emphasized the severity of the victim's injuries. The potential term of incarceration was reiterated. The trial court cited its consideration of La. C. Cr. P. art 894.1(A) and found that there was undue risk that during the period of a suspended sentence or probation, Defendant would commit another crime, that he was in need of correctional treatment and that a lesser sentence would deprecate the seriousness of the crime.

The trial court also considered mitigating and aggravating factors enumerated in La. C. Cr. P. art. 894.1(B) and found that while there were no mitigating factors, there were many aggravating factors, including that the offense manifested deliberate cruelty; that the offender used threats or actual violence in the commission of the offense, which resulted in significant

12

permanent injury and loss to the victim and his family; and that a dangerous weapon was used in the commission of the offense.

The trial court imposed a sentence of 35 years at hard labor without benefit of probation, parole or suspension of sentence. This is well within the range provided by the statute for attempted second degree murder. This sentence is not constitutionally excessive.

This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, the conviction and sentence of Defendant Willie Dewayne Lynn are affirmed.

**AFFIRMED.**